INEZ E. COCHRAN, APPELLANT, V. BELLEVUE BRIDGE COMMISSION, APPELLEE.

119 N. W. 2d 292

Filed February 1, 1963. No. 35402.

O'Hanlon & O'Hanlon, for appellant.

Gross, Welch, Vinardi, Kauffman, Schatz & MacKenzie, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action brought by Inez E. Cochran, the widow of William H. Cochran, deceased, plaintiff, against the Bellevue Bridge Commission, defendant, under the Nebraska Workmen's Compensation Act. The case was tried before a judge of the Nebraska Workmen's Compensation Court, resulting in a dismissal of the plaintiff's claim. A rehearing before the Nebraska Workmen's Compensation Court was waived and the plaintiff appealed directly to the district court. The case was tried before the district court for Sarpy County. The trial court dismissed the plaintiff's petition, thus denying her claim for compensation. From the judgment of the district court, the plaintiff appealed.

The plaintiff assigns as error that the trial court erred in finding that the plaintiff failed to sustain her burden of proof by a preponderance of evidence that the decedent met his death as the result of an accident arising out of his employment; and that the trial court erred in not finding that the plaintiff's husband, while in the course of his employment, suffered accidental injuries leading to his death, which injuries arose out of and in the course of his employment.

"In a workmen's compensation case an appeal to this court is considered and determined de novo upon the record." Eschenbrenner v. Employers Mutual Casualty Co., 165 Neb. 32, 84 N. W. 2d 169.

"In a workmen's compensation case the burden is on the plaintiff to prove by a preponderance of the evidence that an accident occurred." Ruderman v. Forman Bros., 157 Neb. 605, 60 N. W. 2d 658.

"An accident within the Workmen's Compensation Act is an unexpected and unforeseen event happening suddenly and violently and producing at the time objective symptoms of injury. * * * In order that a recovery may be had in an action under the Workmen's Compensation Act it must be proved that an accident occurred arising out of and in the course of employment which accident produced injury that resulted in disability or death. * * * The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim. This rule does not permit a court to award compensation where the requisite proof is lacking." Eschenbrenner v. Employers Mutual Casualty Co., *supra.*

"Whether an accident arises out of and in the course of the employment must be determined by the facts of each case. There is no fixed formula by which the question may be resolved." McDuffee v. Seiler Surgical Co., Inc., 172 Neb. 325, 109 N. W. 2d 384.

It was stipulated by the parties that the evidence adduced in the original hearing in the Nebraska Workmens Compensation Court be received and constitute the evidence on appeal in the district court.

For convenience we will refer to William H. Cochran, deceased, as Cochran.

The record discloses that Inez E. Cochran was married to Cochran in 1919; that at the time of his death Cochran was 66 years of age, 6 feet 2 inches tall, and weighed between 230 and 240 pounds; that he farmed in Taylor County, Iowa, from 1919 until 1948; that in 1949, he moved to Bellevue, Nebraska; and that he obtained a job taking care of a cash register at a filling station for a while, worked in a couple of grocery stores, and then went to work for the Bellevue Bridge Commis-

sion as a tolltaker around 1955. The toll bridge is about half a mile east of Bellevue and crosses the Missouri River into Iowa. Cochran assumed the position of foreman in 1959. His duties required him to make out a report of the types of vehicles, the money taken in, and a report of the day's work of the tolltakers, to deposit the money in the bank, and mail the report to the office in Omaha. In addition, he would relieve tolltakers on their days off, which amounted to three 8-hour shifts a week. He would also relieve the tolltakers when they were on vacation. His daily procedure consisted of walking from his home to the bridge at about 8 a.m. The bridge was about half a mile from his home, downhill and then slightly uphill to the bridge. He would get the money that was taken in by the tolltakers and return home, count the money, make out the reports, check over the tolltakers reports, then take the money to the bank and go to the post office. The bank was about 2½ blocks from his home. On October 20, 1960, he left the house following this usual routine. When he was at home he worked around the yard. Gardening was his hobby, and he worked in the garden. He would also mow the lawn and shovel snow from the sidewalks.

The plaintiff testified that Cochran had no illness of any kind a month before the occurrence on October 20, 1960; that in 1947 or 1948, he had chest and arm pains and was placed in the Veterans' Hospital in Des Moines, Iowa; that at that time he was advised by a doctor to rest about a month; that after 1949, and until 1960, he had chest and anginal pains for which he had medical treatment three times; that he had some nitroglycerin capsules when he was in the Veterans' Hospital which he carried for several years and then threw away, to which the plaintiff protested; that the last time he had any heart trouble was in the 1950's; that he lost perhaps 4 days' work due to a flu epidemic 2 or 3 years before the date of this occurrence; and that at the time

of his death this witness was dependent upon Cochran.

On cross-examination this witness testified that when her husband was released from the Veterans' Hospital he was advised to quit farming and rest because of his heart condition; that the chest and arm pains were caused by angina or a coronary disturbance; that it was no secret that her husband had a bad heart, he had gone to the Veterans' Hospital for that condition; that perhaps he did complain of dizzy spells in 1960; that when he went to Bellevue he was on a disability pension from the United States government for his heart condition; that he gave this pension up because he desired to go to work; and that he also received money from a disability policy which he carried with the Bankers Life Insurance Company of Des Moines, Iowa.

An employee of the Bank of Bellevue testified that she was on duty on October 20, 1960, at the walk-up and drive-in window in the "hut" which is a brick enclosure. There is a driveway between the "hut" and the bank. The enclosure has two serving windows, one for automobile trade and one for walk-up customers. The walk-up sidewalk runs from the sidewalk on the northeast side of the bank and is divided from the driveway by a ledge. The cashier in this facility is at about the same level as the customer, and converses outside through microphones. This witness had known Cochran for about 2 years, during which time he made deposits for the Bellevue Bridge Commission. On the morning of October 20, 1960, he came to the cashier's window. There were no other persons around the facility at that time. This witness spoke to him, and he appeared to her to be normal. He gave her the bridge deposit in a money sack which was taken by her through a door located in the facility. She started to open the money sack and was looking down when she noticed that Cochran's image was no longer at the window. She heard a thud through the microphone, looked up, and saw Cochran lying on the pavement. He had fallen

straight backward and was on his back with his feet toward the drive-in facility and his head away from it. This witness called by telephone to the bank, and the Bellevue rescue squad came to the scene. This witness further testified that it was a clear, cool day, the sidewalks and streets around the bank were dry, it was neither raining or snowing, and there was nothing slippery in the area of the walk leading into the facility.

On cross-examination this witness testified that there was nothing different that morning from any other occasion up to the time that Cochran fell over. The sidewalk he was standing on was made of concrete and was an ordinary sidewalk which was level. She did not see Cochran slip nor hear him say that he had slipped or had been pushed. So far as she knew, he was standing still immediately before he fell. He seemed to be jolly that morning, and she noticed nothing abnormal about his appearance.

Dr. Charles A. Longo testified that he had known Cochran for about 15 years and was his family physician in most cases; that he was called to the Cochran home to treat Cochran for chest pains and anginal type pain in the chest four or five times in 15 years; that he listened to his heart and could detect no murmurs or irregularities; and that Cochran had a normal heart. This witness further testified that he did not see Cochran professionally for at least 8 or 10 years, and that he only saw him four or five times in 15 years. Dr. Longo testified that he saw Cochran on October 20, 1960, at St. Catherine's Hospital in Omaha. At that time he was unconscious. The doctor suspected that Cochran had suffered a cerebral-vascular accident. He showed signs of one who had had a stroke or a cerebral-vascular accident rather than a heart attack. Cochran died on October 22, 1960. This witness ordered an electrocardiogram to ascertain the heart condition of Cochran. The report came back that there was no sign of coronary thrombosis. An autopsy was performed by Dr. Moran,

the pathologist at the hospital. This witness further testified that he indicated on the death certificate that the cause of death was skull fracture with subdural hemorrhage; and that he did not believe Cochran suffered a heart attack.

On cross-examination the surgeon's report, prepared by this witness and submitted to the workmen's compensation insurance carrier in connection with Cochran's death, was admitted in evidence. In the surgeon's report it is stated that Cochran suffered from a large heart, left circumflex branch constriction, and aortic stenosis. This report was prepared on November 8, 1960. This witness further testified on cross-examination that aortic stenosis comes about on a developmental stage over a long period of time; that aortic stenosis is a narrowing of the aorta which is a blood vessel that supplies the rest of the body and emanates from the heart; and that a man with aortic stenosis, or with a circumflex branch or vessel that was constricted, could be sitting at the dinner table or on a couch reading a newspaper and faint or die, and that would not be unusual and has occurred from time to time.

On recross-examination the doctor was asked a hypothetical question as follows: Assuming that Cochran had a large heart, that he had a left circumflex branch constriction, that he had an aortic stenosis, that he was standing at the teller's window on dry pavement, that he did not slip from any ice or snow, mud or debris, and was not pushed or shoved by anybody, and as he stood and talked to the teller he suddenly fell over backwards, would it be reasonable to conclude that he either had a fainting spell or a blackout caused by a heart condition? The doctor testified that the autopsy showed that Cochran had these conditions, and if they were severe enough, they certainly could cause him to faint or blackout and fall, and that this could happen if he were sitting at the table or in a chair in the livingroom.

In Ruderman v. Forman Bros., *supra,* a case in some

respects similar to the case at bar, the plaintiff as the widow of the deceased brought an action to recover death benefits under the Workmen's Compensation Act against the defendants. It was undisputed that her husband died while in the employ of the defendants and while engaged in the performance of his assigned duties. He and another employee were engaged in plastering a house and while so engaged he fell from the position occupied by him and died within a matter of a very few minutes. A doctor who conducted an autopsy testified that in his opinion Ruderman died from an episode of acute coronary insufficiency. The autopsy disclosed a heart which had become badly damaged over an indefinite period before death. A pathologist testified that Ruderman had a heart with extensive coronary disease changes; that in a 62-year-old man these changes were such as were commonly seen in a coronary death; that individuals with that condition sometimes collapse while just sitting at a table eating a meal, or even lying on a couch in the livingroom, or sitting in a chair reading the paper; and that in the case of Ruderman it was conjecture as to which occurred first, the fall or the cardiac failure. The court said: "Ruderman fell, and he died as the result of the failure of his heart to continue to function. The question for determination is narrowed to this: Did the heart fail to function because of the fall, or was the fall a result of the failure of the heart? * * * The evidence on which plaintiff relies leaves any answer to this question in the realm of uncertainty. The answer given by the plaintiff is based in its terms and essence on probability, possibility, speculation, and conjecture, and nothing more. * * * This being true the plaintiff has failed to sustain the burden of proving that Harry Ruderman came to his death as the result of an accident within the meaning of the workmen's compensation law."

In the instant case the plaintiff cites and relies on certain sections contained in 99 C. J. S., Workmen's

Compensation. It is true that under some of said sections there are decisions from other states cited in the footnotes that would appear to support the plaintiff's position in the instant case. However, in referring to the decisions of other jurisdictions it must be borne in mind that the compensation laws of the various states differ widely in many essential respects. The diversity of public policy demonstrated by the differences in the various laws must be considered before decisions of other jurisdictions can be accepted as controlling precedents. See, Bekelski v. Neal Co., 141 Neb. 657, 4 N. W. 2d 741; Eschenbrenner v. Employers Mutual Casualty Co., *supra.*

The following is applicable to this appeal. As far back as the case of Socha v. Cudahy Packing Co., 105 Neb. 691, 181 N. W. 706, 13 A. L. R. 513, the court cited with approval from McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A 306, referring to accidents arising out of employment, as follows: " 'It arises "out of" the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises "out of" the employment. * * * The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence.' "

In Socha v. Cudahy Packing Co., *supra,* the court said:

"If a person familiar with the whole situation could reasonably contemplate that such an accident might result from the peculiar nature and circumstances of the employment, and the nature of the place where the injured man was required to work, then it may reasonably be said to arise out of it. The principles quoted from the McNicol's Case, supra, seem to us to be sound."

We have repeatedly held that mere exertion, which is not greater than that ordinarily incident to the employment, cannot of itself constitute an accident, and if combined with preexisting disease such exertion produces disability or results in death, it does not constitute a compensable accidental injury. See, Foster v. Atlas Lumber Co., 155 Neb. 129, 50 N. W. 2d 637; Hamilton v. Huebner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1; Feagins v. Carver, 162 Neb. 116, 75 N. W. 2d 379; Eschenbrenner v. Employers Mutual Casualty Co., *supra.*

This record discloses no evidence on behalf of the plaintiff that the cause of the fall was industry-related. While the plaintiff's evidence attempted to establish an unexplained fall, that would not be sufficient under the law in this jurisdiction. The record shows that Cochran during his lifetime did suffer from a type of heart disease as heretofore mentioned, and in the absence of any other explanation for the fall, Cochran could have fainted or blacked out, and fallen and hit his head on the cement sidewalk. The same thing could have happened at home or any other place he happened to be at the time he sustained an attack. There was no causal connection between the fall and the employment in which Cochran was engaged in behalf of the Bellevue Bridge Commission.

In Ruderman v. Forman Bros., *supra,* this court said: "A compensation award cannot be based on possibilities or probabilities, but must be based on sufficient evidence that the injured person incurred disability or death as the result of an accident arising out of and in the

course of his employment." See, also, Snowardt v. City of Kimball, *ante* p. 294, 117 N. W. 2d 543.

The plaintiff has failed to prove her case by a preponderance of the evidence under the rules heretofore set forth.

We conclude, in the light of the authorities heretofore set forth and the facts shown in the record, that the trial court did not err as contended for by the plaintiff.

The judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.