LANCE BERGGREN, APPELLEE, V. GRAND ISLAND ACCESSORIES,
INC., APPELLANT.

545 N.W.2d 727

Filed April 5, 1996. No. S–95–201.

Douglas J. Peterson, of Knudsen, Berkheimer, Richardson & Endacott, for appellant.

David P. Kyker for appellee.

WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. INTRODUCTION

The Nebraska Workers' Compensation Court ordered the defendant–appellant employer, Grand Island Accessories, Inc., to pay the plaintiff–appellee employee, Lance Berggren, benefits for solvent toxicity resulting in seizures. In seeking review by the Nebraska Court of Appeals, Grand Island Accessories asserted, in summary, that the compensation court erred in (1) excluding certain evidence, (2) finding that Berggren's condition was compensable, and (3) finding that Berggren sustained a loss of earning power. The Court of Appeals reversed the compensation court's award. *Berggren v. Grand Island Accessories*, 95 NCA No. 45, case No. A–95–201 (not designated for permanent publication). Berggren then successfully sought further review by this court. We now reverse the judgment of the Court of Appeals.

## II. SCOPE OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not

support the order or award. *Cords v. City of Lincoln, ante* p. 748, 545 N.W.2d 112 (1996); *Cox v. Fagen Inc., ante* p. 677, 545 N.W.2d 80 (1996); *Pettit v. State, ante* p. 666, 544 N.W.2d 855 (1996); *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995); *Buckingham v. Creighton University*, 248 Neb. 821, 539 N.W.2d 646 (1995); Neb. Rev. Stat. § 48–185 (Reissue 1993). However, as in other cases, an appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Shilling v. Moore, ante* p. 704, 545 N.W.2d 442 (1996); *Pettit, supra*; *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995); *McGowan v. Lockwood Corp.*, 245 Neb. 138, 511 N.W.2d 118 (1994).

### III. FACTS

Berggren began working for Grand Island Accessories in October 1987, being initially hired as an assembler. As such, his duties included painting and assembling parts, working with paints and thinners, and packaging the parts for shipping.

After working as an assembler for a little over a year, he was transferred to the "sputter coater room," in which the environment was controlled in order to keep the temperature constant and to keep dust out. The main activity in this room was to put a topcoat on styrene parts and then apply a brass coating on them. Berggren's duties in this activity included stocking parts, changing the paint filters, keeping the paint vat full, dumping the runoff of the excess paint, and maintaining the paint guns and paint tunnel. In the course of performing these duties, Berggren came into contact with a variety of solvents.

When Berggren first began working in the coater room, he developed a rash on his arms, ankles, and feet. He testified that he would feel faint and dizzy when working around the paints, changing the filters, and working in the "sputter coater machine" itself. In addition, he would occasionally experience an "aura," a feeling that he now associates with the oncoming of a seizure. He described this sensation as feeling "spacey," developing a funny taste in his mouth, and hearing loud ringing in his ears.

In February or March 1992, Berggren left the coater room and began working in the maintenance department. As a maintenance worker, Berggren fixed various equipment and maintained the company grounds. On occasion, his maintenance duties required him to be in the coater room, although only a few days a month. Berggren continued to work in the maintenance department until his employment with Grand Island Accessories was terminated in January 1993.

Berggren had his first seizure on July 15, 1992, at which time he was working in the maintenance department. He had experienced an aura at approximately noon that day and later, while working on a tape machine, had a seizure. The last thing he remembers is working on the tape machine; being transported in an ambulance is the first thing he remembers after that. He was treated in a hospital emergency room and released, and he spent the rest of the day at home, returning to work the next day.

A second seizure occurred on September 25, 1992. In the time between the two seizures, Berggren occasionally experienced auras while working, but did not have a seizure. The second seizure took place when Berggren was cleaning the lunchroom. He was again transported by ambulance to a hospital where he was treated and released. Berggren did not return to work for several days.

This second seizure was the last one Berggren had while employed by Grand Island Accessories, but he had another in June or July 1993. At the time of the compensation court trial, he was working in the shipping and receiving department at a furnace company.

After Berggren's second seizure, he was seen by a physician, who was unable to determine the cause, notwithstanding that the physician had a number of diagnostic studies performed. Berggren then consulted a second physician, who too was unable to confirm that a toxin was the cause of the seizures.

After his third seizure, Berggren was treated by still another physician, who stated in a report that she believed with reasonable medical certainty that Berggren suffered repetitive solvent toxicity during his employment at Grand Island Accessories and that the toxicity, although not the cause of his

seizure disorder, significantly contributed to its onset. This third physician testified by deposition:

Q. . . . And the basis of your opinion as to the seizures, as I understand it, comes down to the two articles — or the articles that you have referenced regarding studies?

A. It comes down also to my training and experience in clinical toxicology. . . .

. . . There is an extensive literature concerning the risk for solvent-exposed individuals to seizures as well as to dementia and peripheral nerve damage. They are certainly at neurologic risk even though they do not have liver disease or they do not have occular motor dysfunction, and because they are at risk, I think it is contraindicated for a person with a convulsive disorder to become intoxicated, to take drugs of abuse or to be exposed to solvents. I think they are all of high risk and will increase the manifestations or precipitate the onset, and I think that with — I think that's more likely than not.

Q. But is it medically certain?

A. Medical certainty, as I understand it, is an event that is more likely than not; is that correct?

Q. Well, the court will decide that.

A. I distinguish this from absolute medical diagnosis which is usually 95 percent certain but I think this is certainly more likely than unlikely which I believe is reasonable medical certainty for an association.

Q. And that's with regards to your conclusion that the seizure disorder is caused by exposure to solvents?

A. My — is not was caused by the exposure, my opinion is that he has a seizure disorder probably diagnosed as idiopathic epilepsy in which the solvent disorder contributed to the onset and to the repetitive occurrence. That's fair.

## IV. ANALYSIS

### 1. EXCLUSION OF EVIDENCE

In connection with the first assignment of error, Grand Island Accessories urges that the compensation court erroneously sustained Berggren's objection to Grand Island Accessories'

effort to adduce evidence as to whether any other of its employees complained of seizures.

Grand Island Accessories takes the position first that the question is relevant to determining whether Berggren suffers from an occupational disease, which is defined in Neb. Rev. Stat. § 48-151(3) (Reissue 1993) as meaning "only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and shall exclude all ordinary diseases of life to which the general public is exposed."

It is Grand Island Accessories' contention that the proposed question is relevant because the witness' answer would establish that Grand Island Accessories never had any other complaints of seizures by other employees doing the same job as Berggren and because it addresses the issue of whether Berggren's symptoms were characteristic of this job. However, the terms "trade," "occupation," "process," or "employment" used in § 48-151(3) refer not to the specific employer of the injured employee, but, rather, to employers as a whole in a particular occupation. See *Ritter v. Hawkeye–Security Ins. Co.*, 178 Neb. 792, 794, 135 N.W.2d 470, 472 (1965) ("[a]n occupational disease must be a natural incident of a particular occupation and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and which is in excess of that attending employment in general"). It matters not whether any particular employee of Grand Island Accessories suffered from solvent toxicity which contributed to the onset of a seizure disorder, but, rather, the issue is whether an employee who is engaged in the same occupation and exposed to solvents in the same manner and under the same conditions has developed a similar disorder. This, however, was not the question posed.

But Grand Island Accessories asserts that the objection should have been overruled in any event because Berggren stated no basis for asserting it, merely stating " 'Objection, your honor.' " Brief for appellant at 29.

The record reveals that at the time the objection was made, Grand Island Accessories' counsel examined one of its personnel administrative assistants as follows:

Q. Have you ever received any complaints from any of the employees in the years that you've been —

[Berggren's counsel]: Objection. Relevance, Your Honor. We're just here to discuss . . . Berggren.

The Court: Were you done with your question?

[Grand Island Accessories' counsel]: No, I wasn't.

The Court: Okay. Finish your question, and then I'll rule on the objection. Okay?

Q. . . . Have you received any complaints from any other employees who worked in the same area as . . . Berggren with regards to seizures?

A. No.

[Berggren's counsel]: Objection, Your Honor.

The Court: I'll sustain his objection.

[Berggren's counsel]: I'd ask that the answer be stricken from the record.

The Court: Sustained.

It is therefore not the case that Berggren failed to provide a basis for his objection; he in fact stated that relevancy was the basis for his objection.

As the compensation court is not bound by the usual common–law or statutory rules of evidence, the admission of evidence is within that court's discretion, whose determination in this regard will not be reversed upon appeal absent an abuse of discretion. *Paulsen v. State, ante* p. 112, 541 N.W.2d 636 (1996). Therefore, the standard of review of an assigned error directed at the exclusion or admission of evidence is one of abuse of discretion. *Id.* Under the circumstances, we cannot say that the compensation court abused its discretion in ruling that the evidence sought to be elicited was not relevant.

Thus, there is no merit to the first assignment of error.

### 2. COMPENSABILITY OF SEIZURE DISORDER

In claiming in the second assignment of error that the compensation court erred in finding that there was sufficient competent medical evidence to establish a causal link between Berggren's work and his condition, Grand Island Accessories argues that as two physicians were unable to find a link between Berggren's work and his condition and that as the third

physician's opinion was not based upon the requisite degree of medical certainty, the record is insufficient as a matter of law to support a ruling in favor of Berggren.

First, it must be remembered that it is for the compensation court to determine which, if any, of the expert witnesses to believe. *Surratt v. Watts Trucking, ante* p. 35, 541 N.W.2d 41 (1995). Even if the first two physicians' opinions can be characterized as disputing the third physician's opinion, the compensation court was free to disbelieve the first two and believe the third. In addition, in testing the sufficiency of evidence to support findings of fact made by the compensation court after rehearing, the evidence must be considered in the light most favorable to the successful party. *Stansbury v. HEP, Inc.*, 248 Neb. 706, 539 N.W.2d 28 (1995); *Aken v. Nebraska Methodist Hosp.*, 245 Neb. 161, 511 N.W.2d 762 (1994); *McGowan v. Lockwood Corp.*, 245 Neb. 138, 511 N.W.2d 118 (1994). Thus, the fact that in the opinions of the first two physicians there was no causal link between Berggren's work and his seizure disorder is of no consequence.

The question, therefore, is whether the third physician's opinion that although the repetitive solvent toxicity Berggren suffered did not cause his seizures but contributed to their onset was based on the degree of medical certainty required to support the compensation court's findings. Grand Island Accessories offers seven separate criticisms of the third physician's testimony in its brief, including that she has no special training in the area of diagnosing and treating seizure disorders; that her area of experience in toxicology is with regard to environmental toxicology, which is to be distinguished from solvents; that she did not review the air quality testing results at Grand Island Accessories; and that the reports she relied on in reaching her conclusions were speculative. All of these arguments relate to the foundation for the admission of her testimony, not to its sufficiency, if admissible. Both the third physician's report and her deposition testimony were admitted into evidence without any objection from Grand Island Accessories on the basis of foundation. In fact, the deposition testimony of the third physician was offered into evidence by Grand Island Accessories. Thus, its arguments going to the

foundational basis for the opinion may not be considered. See, *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

What remains is Grand Island Accessories' argument that the third physician's opinion is not sufficient as a matter of law to establish causation because she stated only that it was more likely than not that Berggren's exposure to solvents contributed to the onset of his seizures.

The seminal case on the issue of the degree of certainty required in medical testimony is *Welke v. City of Ainsworth*, 179 Neb. 496, 138 N.W.2d 808 (1965). Therein, a policeman was injured while arresting a suspect. The policeman received an award of compensation and the employer appealed, contending that the medical testimony was insufficient to establish causation. Evidence from three separate doctors had been admitted. One testified in response to a hypothetical question that in his opinion, an injury described by the claimant could have caused the condition that had been described in the testimony. Another testified that based on a reasonable degree of medical certainty, the scuffle described could have initiated the train of events that resulted in the compression of the nerve. In the opinion of the last doctor, the claimant's injury and resultant disability was probably due to the scuffle.

On appeal, we first stated the well–established rule that a workers' compensation award cannot be based on possibility or speculation; if an inference favorable to the claimant can only be reached on the basis thereof, then the claimant cannot recover. We observed that under that rule, the testimony of the first two doctors would be inadequate to support the award. However, that testimony, considered in conjunction with that of the third doctor, rendered the evidence sufficient. We wrote:

> The language used by [the third doctor] is as definite as a doctor can be without giving a positive opinion that the scuffle caused the injury. He is familiar with the probabilities and selects the cause which within his range of experience he has reason to believe is the cause of the disability. In the area of certain disabilities it is impossible for a reputable doctor to testify with absolute certainty that one cause and one cause alone is the reason for the

disability. Medical diagnosis is not that exact a science. . . .

. . . As we said in . . . Schwabauer v. State, 147 Neb. 620, 24 N. W. 2d 431: "If a claimant has adduced competent evidence having probative value which preponderantly convinces the trier or triers of the fact that claimant had an accident and incurred a disability arising out of and in the course of his employment, notwithstanding the trier or triers of the fact may recognize a possibility or even a probability that this was not true, an award of compensation thereon is proper and on appeal therefrom must be sustained."

. . . .

To recover in a workmen's compensation case a claimant must offer proof which preponderates in his favor on each of the indispensable elements of his claim. Seger v. Keating Implement Co., 157 Neb. 560, 60 N. W. 2d 598. Where the testimony gives rise to conflicting inferences of equal degree of probability so that the choice between them is a mere matter of conjecture, a compensation award cannot be sustained. Where, however, the inferences are not equally consistent and the more probable conclusion is that for which the claimant contends, then the claimant sustains his burden of proof on the element involved.

*Welke*, 179 Neb. at 502–05, 138 N.W.2d at 812–13. Therefore, *Welke* teaches that expert medical testimony couched in terms of probability is sufficient to sustain a workers' compensation claimant's burden of proof.

As the phrase "more likely than not" is the equivalent of the statement that a causal relationship is probable, *Husted v. Peter Kiewit & Sons Constr. Co.*, 210 Neb. 109, 313 N.W.2d 248 (1981) (White, J., dissenting), citing *People v. Erkinger*, 119 Cal. App. 2d 551, 259 P.2d 492 (1953), *Aultman v. Dallas Ry. & Term. Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953), and *Hallum v. Omro*, 122 Wis. 337, 99 N.W. 1051 (1904), such testimony also satisfies the burden of proof. See, also, *Paulsen v. State, ante* p. 112, 541 N.W.2d 636 (1996) (suggesting testimony giving rise to inference of probability is relevant).

The *Welke* reasoning was utilized in *Lane v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 411, 308 N.W.2d 503, 512 (1981), wherein we proclaimed:

> Although it is generally stated that medical testimony must be given with "reasonable medical certainty," we have been unable to find any Nebraska case which specifically so states. It has frequently been held that medical testimony couched in terms of "possibility" is not sufficient, although when such testimony is in terms of "probability" it is sufficient. We have held that "reasonable certainty" and "reasonable probability" are one and the same thing.

See, *Morton v. Hunt Transp.*, 240 Neb. 63, 480 N.W.2d 217 (1992); *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991); *Hohnstein v. W.C. Frank*, 237 Neb. 974, 468 N.W.2d 597 (1991).

A further example of this reasoning is found in *Castro v. Gillette Group, Inc.*, 239 Neb. 895, 479 N.W.2d 460 (1992). In that case, a claimant accidentally injured during the course of his employment was found by the compensation court to have been permanently and partially disabled as a result thereof and entitled to benefits. However, the compensation court further found that he had not sufficiently established that the pain therapy he sought was reasonably necessary treatment. On appeal, we ruled that because the testimony of the claimant's medical expert regarding the necessity of the pain therapy was couched in terms of possibility and hopefulness, rather than probability, the compensation court's denial of that service was not erroneous.

However, Grand Island Accessories calls the foregoing rulings into question by directing our attention to two cases, *Husted, supra*, and *Fuglsang v. Blue Cross*, 235 Neb. 552, 456 N.W.2d 281 (1990). These two cases hold that an expert medical opinion which indicates that a causal connection is more likely than not lacks the sufficient definiteness and certainty required for it to be the basis of a workers' compensation award or a verdict.

In *Husted*, the claimant injured his lower back while employed by the defendant as a carpenter and brought a

workers' compensation action. The compensation court found that the claimant had established a causal connection between his cervical disk disorder and the accident. On appeal by the defendant, we observed that the finding of the compensation court rested upon the testimony of a medical expert who, upon being asked whether the cervical injury occurred at the time of the accident or during bed rest following the accident, testified merely that it was more likely that the cervical injury occurred from the accident than while he was at bed rest. We then concluded that such testimony lacked the definiteness and certainty necessary to form the basis for an award.

In doing so, we relied on *Camarillo v. Iowa Beef Processors, Inc.*, 201 Neb. 238, 266 N.W.2d 917 (1978), and *Marion v. American Smelting & Refining Co.*, 192 Neb. 457, 222 N.W.2d 366 (1974). However, on further study, it becomes clear that neither *Camarillo* nor *Marion* holds that expert medical testimony that an injury was more likely caused by a certain event than not is insufficient to sustain a compensation award. In *Camarillo*, 201 Neb. at 243, 266 N.W.2d at 919, we reversed an award to a claimant because "[t]he evidence . . . on behalf of the [claimant] does not even meet the standard of 'probability' in Welke . . . . An award for permanent disability cannot be based on mere possibilities." Thus, the *Camarillo* award was reversed not because the expert witness testified that a causal connection was probable, or more likely than not, but, rather, because the opinion of the expert witness did not rise to that level.

In *Marion*, the claimant suffered from gout and hypertension, conditions he attributed to lead poisoning suffered while working for the defendant 16 years earlier. The claimant's medical witness testified that the claimant's illness was secondary to lead intoxication, probably ingested during his employment with the defendant. The defendant's medical experts testified that the claimant's exposure to lead during his employment was not the cause of his current disabling medical problems and that there was no relationship between the claimant's present condition and his employment by the defendant. On appeal, we held that "[w]here the record in a case reflects nothing more than a resolution of conflicting

medical testimony, there appears no purpose in this court substituting its judgment of facts for the judgment of the compensation court." *Id.* at 460, 222 N.W.2d at 368. We therefore affirmed the dismissal of the claimant's petition, not because his expert's testimony was insufficient, but because the lower tribunal decided to believe the defendant's expert witnesses rather than the claimant's. It is clear, therefore, that the cases on which we rested the *Husted* opinion do not support it.

The issue in the second case relied upon by Grand Island Accessories, *Fuglsang, supra,* was the admissibility of certain expert testimony, not whether such testimony was sufficient to meet a claimant's burden of proof. The dispute in *Fuglsang* concerned whether the plaintiff was covered by a health insurance policy issued by the defendant or whether the condition was excluded from coverage because it was a preexisting illness. The defendant wished to elicit testimony in this regard from its medical expert by asking him to rest his opinion on whether " 'on a 50/50 basis, [it is] more likely than not . . . .' " *Fuglsang,* 235 Neb. at 554, 456 N.W.2d at 283. The trial court excluded such testimony. On appeal, we, relying on *Husted,* held that the exclusion of such testimony by the trial court was not an abuse of discretion. Leaving aside whether the question was one actually entrusted to the discretion of the trial court, we have now seen that in any event, the *Husted* ruling on the causation issue was improvident.

Thus, to the extent that *Husted v. Peter Kiewit & Sons Constr. Co.,* 210 Neb. 109, 313 N.W.2d 248 (1981), and *Fuglsang v. Blue Cross,* 235 Neb. 552, 456 N.W.2d 281 (1990), hold that a medical expert's opinion based on a reasonable degree of medical probability is not sufficient to establish a causal relationship, they are overruled.

Accordingly, there is no merit to the second assignment of error.

### 3. LOSS OF EARNING POWER

Lastly, Grand Island Accessories complains of the compensation court's finding that Berggren sustained a loss of earning power, arguing that the earning capacity evaluation offered by Berggren does not comply with the analysis set forth

by this court in *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980).

Neb. Rev. Stat. § 48–121(2) (Reissue 1993) provides that certain types of partial disabilities shall be compensated based on "the difference between the wages received at the time of the injury and the earning power of the employee thereafter . . . ." In *Sidel*, we explained that the term "wages," as used in the foregoing statute, is not a complete synonym for earning power.

"The ability to earn wages in one's employment is, obviously, a primary base in the admeasurement of earning power, but several other component factors are also involved. These include eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work in which engaged. If any one or more of these four elements of earning power are affected and only partially impaired, as the result of an accident arising out of and in the course of employment, and the disability is not one covered by subdivision 3 of section 48–121, Comp. St. 1929, the right to compensation is governed by subdivision 2 of such section. The right in such cases rests, as we have indicated, upon the fact that some preexisting element of earning capacity has been impaired."

205 Neb. at 546–47, 288 N.W.2d at 485.

In *Thom v. Lutheran Medical Center*, 226 Neb. 737, 740, 414 N.W.2d 810, 813–14 (1987), we expanded on the foregoing by writing:

Earning power, as used in Neb. Rev. Stat. § 48–121(2) . . . is measured by an evaluation of a worker's general eligibility to procure and hold employment, the worker's capacity to perform the required tasks, and the worker's ability to earn wages in employment for which he or she is engaged or fitted. . . . Earning power is synonymous neither with wages . . . nor with loss of physical function . . . . Nonetheless, loss of physical function may affect a worker's eligibility to procure and hold employment, his or her capacity to perform the required tasks, and the ability to earn wages in employment for which he or she is engaged or fitted. Thus, while there is no numerical

formula for determining one's earning power following an injury to the body as a whole . . . the extent of such impairment or disability may provide a basis for determining the amount of that worker's loss of earning power.

We there ruled that the range of expert medical opinions that the claimant's physical limitation translated to a permanent partial disability of from 7 to 25 percent of the body as a whole, the fact that she had been unable to find employment, and the evidence that her employment prospects had been diminished as a result of her accident supported the compensation court's finding that she suffered a 25–percent loss of earning power.

Here, the third physician testified that Berggren has a disability of 100 percent for employment involving significant solvent exposure and that he should not work in any environments or any occupations hazardous for individuals with seizure disorders. It was also her opinion that Berggren has a permanent partial disability estimated at 10 percent due to his toxicity resulting from repetitive exposure to solvents during his employment at Grand Island Accessories. The earning power evaluation received in evidence opined that based on Berggren's current income, the limitations on his employment as described by the third physician, and the loss of access to the labor market in jobs requiring exposure to hazards, Berggren had suffered a 29.4–percent loss of earning potential. As the loss of earning power evaluation takes into account Berggren's eligibility to procure employment generally, the ability to earn wages, and the extent of his body impairment, it complied with the requirements set forth in *Sidel* and *Thom*.

As factual determinations by the Nebraska Workers' Compensation Court will not be set aside on appeal unless they are clearly erroneous, this assignment of error too is meritless. *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995).

## V. JUDGMENT

For the foregoing reasons, as first noted in part I, the judgment of the Court of Appeals is reversed.

REVERSED.

FAHRNBRUCH, J., participating on briefs.