DUANE F. SVEHLA, PERSONAL REPRESENTATIVE OF THE ESTATE OF MARJORIE ELLA SVEHLA, APPELLANT AND CROSS-APPELLEE, V. BEVERLY ENTERPRISES, DOING BUSINESS AS COLONIAL MANOR, APPELLEE AND CROSS-APPELLANT.

567 N.W.2d 582

Filed June 3, 1997.   No. A-96-779.

Joseph F. Gross, Jr., of Timmermier, Gross & Burns, for appellant.

Anne E. Winner, of Keating, O'Gara, Davis & Nedved, P.C., for appellee.

HANNON, MUES, and INBODY, Judges.

MUES, Judge.

## INTRODUCTION

This action is brought by Duane F. Svehla, personal representative of the estate of Marjorie Ella Svehla, against Beverly

Enterprises, doing business as Colonial Manor (Colonial Manor). A single judge of the Workers' Compensation Court dismissed the petition after finding that Duane failed to prove that Marjorie's injuries were caused by an accident arising out of her employment. The review panel affirmed, and Duane appealed. For the reasons stated herein, we affirm.

## STATEMENT OF CASE

On April 4, 1994, Marjorie was working as a registered nurse at Colonial Manor, a nursing home in Clarkson, Nebraska. On this date while leaving the nursing home to go home and before getting into her car, Marjorie fell and sustained an acute subdural hematoma. Marjorie died on April 6.

Marjorie's husband, Duane, testified to the events of April 4 as follows: Marjorie arrived home sometime after 7:30 p.m. and told Duane that while walking out of the nursing home to her car, she tripped and fell, loosening some teeth and chipping one tooth. Marjorie then stated, "My eyes are kind of blurry." With Duane's help, Marjorie contacted her supervisor, Spring Wendt. According to Duane, Marjorie told Wendt that she was walking to her car when she tripped and fell, loosening some teeth.

Wendt also testified as to the substance of her conversation with Marjorie. According to Wendt, she asked Marjorie if she had slipped, tripped, or fallen, and Marjorie responded that she did not know, she just remembered getting up, getting into her car, and driving home. Wendt testified that neither Duane nor Marjorie advised her that Marjorie had tripped or slipped. To the contrary, Wendt stated that Marjorie indicated that she did not know what had happened, she just found herself on the ground.

By the end of her conversation with Wendt, Marjorie had begun vomiting and her speech had become slurred. Duane immediately took Marjorie to the emergency room at Columbus Community Hospital in Columbus, Nebraska. By the time she arrived at the hospital, Marjorie was no longer communicative. After 45 minutes at the Columbus hospital, Marjorie was taken by rescue squad to Bishop Clarkson Memorial Hospital in Omaha, Nebraska. Dr. John Greene, a neurosurgeon, diagnosed

Marjorie with an acute subdural hematoma and performed surgery to evacuate the hematoma. Marjorie died on April 6, 1994.

Duane testified that Marjorie normally parks in the parking lot in front of Colonial Manor. According to Wendt, there is a parking lot in front of Colonial Manor adjacent to a sidewalk leading to the front door. Wendt testified that this is a flat surface with no steps, cracks, or defects. Wendt also testified that Marjorie typically parked in this parking lot.

The record reflects that Marjorie had a history of gait imbalance prior to this incident. In 1988, Marjorie saw a physician, complaining of, among other things, an unstable gait. Marjorie saw a specialist who noted in a letter dated June 13, 1988, that Marjorie tended to lean forward when she walked. An exam revealed marked hydrocephalus or fluid around Marjorie's brain, and in 1988, a shunt was placed in her head to control the fluid and alleviate her symptoms. Duane testified that to his knowledge, after 1988, Marjorie had no trouble with dizziness or unsteadiness.

Three of Marjorie's coworkers testified otherwise. Wendt testified that Marjorie leaned forward when she walked and that her gait became more unsteady as the day wore on. According to Wendt, Marjorie frequently grabbed onto things to steady herself. A licensed practical nurse at Colonial Manor testified that she worked with Marjorie twice a week and that Marjorie had a "wider stance" than most people. She also stated that Marjorie often grabbed the rail or wall to steady herself. Another licensed practical nurse at Colonial Manor also testified that she worked with Marjorie approximately two times a week, that Marjorie typically walked with her feet "splayed," and that she looked directly down at her feet. According to this witness, Marjorie frequently grabbed railings to steady herself and was generally unsteady. This witness further attested that on April 4, 1994, between 6:30 and 7 a.m., she observed Marjorie lose her balance while walking down the hall and grab the railing to steady herself. She also stated that Marjorie was not immediately responsive to questions on this date and that she would take 10 to 15 minutes to respond.

Dr. Greene concluded, with a reasonable degree of medical certainty, that Marjorie died from an acute subdural hematoma secondary to a fall and that he could find no medical reason for the fall. He opined that "[m]ost likely [Marjorie] tripped" and stated that his opinion was based on "[c]ommon sense." Dr. Greene's opinion was based upon the history given to him that Marjorie had fallen when leaving work. He admitted that he was unaware Marjorie walked with an unsteady gait.

Dr. Annamaria Guidos, medical director of the traumatic brain injury unit at Madonna Rehabilitation Hospital, in Lincoln, Nebraska, opined that the cause of Marjorie's death was a large subdural hematoma. Dr. Guidos opined that absent a witness to the fall or a definitive history, it would be impossible for anyone to state with a reasonable degree of medical certainty the cause of the fall or the lack of a medical reason for the fall.

A petition was filed on February 9, 1995, alleging that Marjorie slipped and fell on Colonial Manor's premises, striking her head and causing injuries which resulted in her death. By answer, Colonial Manor denied that Marjorie sustained a compensable injury arising out of and in the course and scope of her employment. Following an evidentiary hearing, a single judge of the Workers' Compensation Court dismissed the petition.

The court noted that Marjorie suffered from a prior history of neurological problems, that she had in the past complained of gait disturbance, and that she had a shunt placed in her head in 1988. The court also noted the testimony of Marjorie's coworkers that on a daily basis, they noticed that Marjorie walked with a gait imbalance and leaned forward, and that she typically had to grab objects to catch her balance. It further noted the testimony of one coworker that during the morning of April 4, 1994, Marjorie lost her balance and had to grab onto a railing to steady herself.

The trial judge found that Duane had failed to show by a preponderance of the evidence that Marjorie's injuries were caused by an accident arising out of her employment. In so doing, he observed:

Although something happened that led to terrible untoward results after the plaintiff left work on April 4, 1994,

we do not know and the evidence is lacking as to what that was. . . .

. . . .

. . . [T]he Court is well aware of Dr. Greene's statement of causation or a lack of a medical reason for causation. The Court respects Dr. Greene's medical ability and forthrightness in his deposition but finds . . . his statement of causation to be non-persuasive to the trier of fact concerning causation. Rather, the Court is more persuaded that, as likely, the reason the plaintiff would have fallen would have been the gait instability as testified to by plaintiff's co-workers who are registered nurses and by the plaintiff's prior treating neurologist, Dr. Schima, and neurosurgeon, Dr. McKinney, who also noted plaintiff's's [sic] gait imbalance.

The trial judge then went on to resolve credibility issues on how the fall occurred by accepting Wendt's version of what Marjorie had told her instead of Duane's version. The court ultimately stated:

This is a case with an unfortunate and tragic end. Regrettably, there were no witnesses to the accident. We do not know specifically how or why the event occurred. There have been various theories presented to the Court but the Court as the trier of fact has not been persuaded. Since no one observed or knows for sure what happened, the Court can only speculate as most of the experts have done as to causation. The Court is not allowed to speculate and finds that the plaintiff's petition should therefore be dismissed.

The order of dismissal was affirmed by a three-judge panel by order dated June 3, 1996, and this appeal timely followed.

## ASSIGNMENTS OF ERROR

Duane asserts that the review panel erred in (1) finding that Marjorie fell as a result of gait imbalance, (2) failing to apply the positional risk doctrine, and (3) receiving into evidence Dr. Guidos' deposition testimony. By cross-appeal, Colonial Manor asserts that the trial court erred in admitting Marjorie's statements to Duane, as these were inadmissible hearsay.

## STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Snipes v. Sperry Vickers*, 251 Neb. 415, 557 N.W.2d 662 (1997); *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996).

## DISCUSSION

*Receiving Deposition Into Evidence.*

At the outset, we address Duane's third assigned error that the trial court erred in receiving into evidence Dr. Guidos' deposition, taken just 2 days before trial. According to Duane, the deposition was untimely and he was substantially prejudiced thereby because it injected new opinions that challenged the causation testimony of Dr. Greene.

Workers' Comp. Ct. R. of Proc. 4 (1996) provides that a party "shall disclose to every other party any evidence that the party may present at trial by or from any witness qualified as an expert. . . . Unless the court designates a different time, the disclosures shall be made at least 30 days before trial . . . ."

The Workers' Compensation Court is not bound by common law or statutory rules of evidence. See, Neb. Rev. Stat. § 48-168 (Reissue 1993); *Paulsen v. State*, 249 Neb. 112, 541 N.W.2d 636 (1996) (citing *Sherard v. Bethphage Mission, Inc.*, 236 Neb. 900, 464 N.W.2d 343 (1991)). It is within the Workers' Compensation Court's discretion to decide whether or not evidence is admissible, and this determination will not be reversed absent an abuse of discretion. *Paulsen, supra.*

In an August 1995 letter, Dr. Guidos opined that acute subdural hematoma was the probable cause of Marjorie's death. She also noted, "I do not believe that I can say with any reasonable medical probability what caused the fall and that perhaps a witness would be best able to tell us." On September 18,

1995, counsel for Colonial Manor sent Duane's counsel a letter stating that Dr. Guidos would be deposed on October 3 and that Dr. Guidos was expected to testify consistent with her August letter. In her deposition, Dr. Guidos stated that absent additional information, she did not believe anyone could state with a reasonable degree of medical certainty what caused Marjorie's fall.

The trial court admitted the October 1995 deposition over the objection that the deposition was taken only 2 days before trial. It specifically found that the matters Dr. Guidos attested to in the deposition were basically the same as those contained in her August letter.

We cannot say that the trial court abused its discretion by admitting this deposition testimony. Although untimely, we fail to see how Duane was prejudiced as a result of this untimeliness. To the contrary, we agree with the trial court that Dr. Guidos' deposition testimony is basically the same as her August letter, that is, absent witness testimony, one cannot state based upon a reasonable degree of medical certainty the cause of the fall. Dr. Guidos' deposition merely expanded upon and explained further the conclusions reached in her August letter. Duane's counsel attended the deposition but elected not to cross-examine Dr. Guidos. Duane's counsel also did not ask for a continuance. See *Brown v. Hansen*, 1 Neb. App. 962, 510 N.W.2d 473 (1993) (continuance is ordinarily proper method for dealing with claim that there has been failure to disclose in timely manner). See, also, *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985) (notwithstanding language of pretrial order, court did not err in allowing untimely report into evidence absent showing that other party's trial preparation was hampered and party made no request for continuance).

Thus, we find that the trial court did not abuse its discretion in allowing the deposition testimony of Dr. Guidos taken 2 days before trial into evidence where Duane was not prejudiced by its untimeliness. Duane's third assignment of error is without merit.

*Factual Finding of Gait Imbalance.*

In his first assigned error, Duane asserts that the trial court erred in finding that Marjorie's fall was caused by gait imbal-

ance. Upon close scrutiny, we observe that the trial court did not expressly find that gait imbalance caused Marjorie's fall. Rather, it concluded that the evidence failed to establish what happened after Marjorie left work on April 4. The court found, based upon the testimony of Marjorie's coworkers and prior treating neurologist and neurosurgeon, that Marjorie suffered from a gait imbalance and that it, just as likely as anything else, caused her to fall on April 4. The court also accepted Dr. Guidos' testimony that absent a witness or definitive history, it would be impossible for anyone to state with a reasonable degree of medical certainty what caused Marjorie's fall. The court concluded: "We do not know specifically how or why the event occurred. . . . Since no one observed or knows for sure what happened, the Court can only speculate as most of the experts have done as to causation." The court correctly noted that it is not allowed to speculate with regard to causation. See *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996).

We cannot say that the trial court's factual determination that Marjorie suffered from gait imbalance and that this condition *could* have caused her to fall is clearly wrong. The evidence shows that Marjorie suffered from a history of neurological problems. Her coworkers testified that they noticed Marjorie suffering from balance problems from 1990 until her death and that she walked in an unusual manner, with her feet splayed. According to them, it was a common occurrence for Marjorie to have to grab onto rails or walls in order to balance herself. Although Duane contends that the trial court erroneously received this testimony into evidence because Marjorie's coworkers were not competent to offer such testimony, none of these witnesses testified as experts. Rather, each testified as a lay witness as to their observations, or what they perceived during the time they worked with Marjorie, as is proper for lay witnesses under Neb. Rev. Stat. § 27-701 (Reissue 1995).

The findings of fact made by a trial judge of the compensation court have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Scott v. Pepsi Cola Co.*, 249 Neb. 60, 541 N.W.2d 49 (1995).

When testing the sufficiency of the evidence to support the factual findings of a trial court, the evidence is considered in the light most favorable to the successful party, and the successful party is given the benefit of every inference reasonably deducible from the evidence. *Monahan v. United States Check Book Co.*, 4 Neb. App. 227, 540 N.W.2d 380 (1995). There is ample evidence to support the trial court's factual determination that Marjorie suffered from a gait imbalance and that this condition could have caused her fall.

Dr. Greene's opinion to the contrary and his opinion that Marjorie's fall was not the result of a medical condition does not require a different result. The trial court specifically discounted Dr. Greene's testimony noting the "overwhelming" testimony that Marjorie did in fact suffer from a gait imbalance. It also noted that Dr. Greene's testimony lacked a historical base.

When the record in a workers' compensation case presents conflicting medical testimony, an appellate court will not substitute its judgment for that of the compensation court. *Kerkman, supra.* It is for the compensation court to determine which, if any, of the expert witnesses to believe. *Berggren, supra.*

*Effect of Findings.*

Concluding that Marjorie suffered from gait imbalance and that this condition could have caused her fall on April 4, the trial court found that Duane failed to meet his burden of proof as to causation.

In his second assigned error, Duane contends that the Workers' Compensation Court erred as a matter of law in ignoring application of the positional risk doctrine. His argument is that Nebraska has adopted this doctrine in *Nippert v. Shinn Farm Constr. Co.*, 223 Neb. 236, 388 N.W.2d 820 (1986), and under it, Marjorie's injuries are presumed to "arise out of" her employment with Colonial Manor, even though any other person would have met with the same accident irrespective of his or her employment.

In a workers' compensation case, the claimant must establish by a preponderance of the evidence that the injury for which an award is sought arose out of and in the course of

employment. *Edmonds v. IBP, inc.*, 239 Neb. 899, 479 N.W.2d 754 (1992). The determination of causation is ordinarily a matter for the trier of fact, whose factual findings will not be set aside unless clearly wrong. *Kerkman, supra.* Where the testimony gives rise to conflicting inferences of an equal degree of probability so that the choice between them is a matter of conjecture, a compensation award cannot be sustained. *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996).

The main issue presented here is not whether Marjorie's injury occurred in the course of her employment. Hence, Duane's reliance upon cases applying the bright-line premises rule are misplaced. That rule generally addresses the "in the course of" requirement, and the pivotal issue is whether the employee fell on or off the employer's premises. Cases applying that rule typically involve slip-and-fall situations where the cause of the fall is not in dispute and where the existence of an idiopathic condition is not raised. See, *Johnson v. Holdrege Med. Clinic*, 249 Neb. 77, 541 N.W.2d 399 (1996) (employee slipped on ice); *Buck v. Iowa Beef Processors, Inc.*, 198 Neb. 125, 251 N.W.2d 875 (1977); *Thomsen v. Sears Roebuck & Co.*, 192 Neb. 236, 219 N.W.2d 746 (1974); *Acton v. Wymore School Dist. No. 114*, 172 Neb. 609, 111 N.W.2d 368 (1961) (employee slipped and fell). In this case, the evidence conflicts as to what caused Marjorie to fall and clearly establishes that Marjorie suffered from an idiopathic condition; thus, the premises rule per se provides little guidance here.

The issue defined by the parties on appeal and the one upon which the trial court rested its dismissal is the "arising out of" requirement. The term "arising out of" refers to an accident and its origin, cause, and character, that is, whether it resulted from risks arising within the scope of an employee's job. *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996); *Cox v. Fagen Inc.*, 249 Neb. 677, 545 N.W.2d 80 (1996). According to Duane, the positional risk doctrine applies to this case and creates a presumption that Marjorie's injuries arose out of her employment.

In *Nippert, supra*, the Supreme Court applied the positional risk doctrine and awarded an employee compensation for

injuries received as a result of a tornado striking the worksite. As relates to the positional risk doctrine, the court stated, "Under this theory an employee's injuries are compensable as long as his employment duties put him in a position that he might not otherwise be in which exposes him to a risk, even though the risk is not greater than that of the general public." *Id.* at 238, 388 N.W.2d at 822. As stated

> [i]n 1 A. Larson, The Law of Workmen's Compensation § 8.12 at 3-23 (1985), the positional risk test is as follows:
>
> " '[W]hen one in the course of his employment is reasonably required to be at a particular place at a particular time and there meets with an accident, although one which any other person then and there present would have met with irrespective of his employment, that accident is one "arising out of" the employment of the person so injured.' "

*Nippert*, 223 Neb. at 238-39, 388 N.W.2d at 822.

As Professor Larson explains, the positional risk doctrine proceeds on the rationale that the particular source of injury is "neutral," because the nature of a known risk is associated neither with the employment nor the employee personally. Such is obviously the case in "act of God" cases such as *Nippert.*

Duane relies heavily on Professor Larson's contention that those jurisdictions that have adopted the positional risk doctrine should rationally conclude that in cases of *pure* unexplained falls which occur in the course of employment, the "arising-out-of" requirement is similarly met. See 1 Arthur Larson & Lex K. Larson, The Law of Workmen's Compensation § 10.31(a) (1996).

It is apparently Duane's position that since the Supreme Court has adopted the positional risk doctrine in the case of a tornado-caused injury in *Nippert*, we must necessarily conclude that the arising-out-of requirement was met in this case where the cause of Marjorie's fall in the parking lot is "unexplained." Whether Nebraska would apply the "neutral" or "positional risk" rationale to a purely unexplained fall case presents an interesting question, but one that we need not decide. The fact is that this case is not a *pure* "unexplained fall" case. While the trial court concluded, inter alia, that the evidence was not suffi-

cient to establish "how or why" the fall occurred, it also found that it was "persuaded that, as likely, the reason the plaintiff would have fallen would have been the gait instability."

Professor Larson is quick to distinguish between unexplained falls and "idiopathic" falls. Unexplained-fall cases begin with a completely neutral origin of a mishap, while idiopathic-fall cases begin with an origin which is admittedly personal and which therefore requires some affirmative employment contribution to offset the prima facie issue of personal origin. 1 Larson & Larson, *supra*, § 12.11. When there is at least some evidence of a possibility of a personal or idiopathic factor contributing to the fall, the fall is not a true unexplained-fall case. 1 Larson & Larson, *supra*, § 10.31(b). Professor Larson notes that "if there is some evidence in the record of possible idiopathic involvement, the case is no longer a pure unexplained-fall case . . . ." *Id.*, § 10.31(a) at 3-113 n.72 (in commenting on *Mackay v. State Accident Ins. Fund*, 60 Or. App. 536, 654 P.2d 1144 (1982)).

According to Professor Larson, a different rule applies to idiopathic-fall cases:

> Injuries arising out of risks or conditions personal to the claimant do not arise out of the employment unless the employment contributes to the risk or aggravates the injury. When the employee has a preexisting physical weakness or disease, this employment contribution may be found either in placing the employee in a position which aggravates the effects of a fall due to the idiopathic condition, or in precipitating the effects of the condition by strain or trauma.

1 Larson & Larson, *supra*, § 12.00 at 3-416.

According to this rule, injuries sustained in a fall caused from a personal risk or condition are compensable if the employment places the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle. *Id.*, § 12.11. See, e.g., *Nunn v. Texaco Trading & Transp.*, 3 Neb. App. 101, 523 N.W.2d 705 (1994) (injury compensable where truck accident occurred when employee blacked out, arguably due to idiopathic condition, while driving truck hauling crude oil).

We believe that the following decisions of the Nebraska Supreme Court are generally in accord with the idiopathic-fall rules proffered by Professor Larson as quoted above. In *Cochran v. Bellevue Bridge Commission*, 174 Neb. 761, 119 N.W.2d 292 (1963), the employee-decedent worked as a toll-taker and made bank deposits for his employer. While making one such deposit at the bank, the employee fell straight backward and died. Nobody witnessed the fall. The Supreme Court, at that time applying a de novo standard of review, found that the employee suffered from a heart condition and that "in the absence of any other explanation," *id.* at 770, 119 N.W.2d at 298, he *could* have fainted, or blacked out, and fallen because of this condition. Citing the familiar proposition of law that a compensation award may not be based upon possibilities or probabilities, the Supreme Court found that the plaintiff had failed to prove her case by a preponderance of the evidence. *Id.*

In *Haufe v. American Smelting & Refining Co.*, 163 Neb. 329, 79 N.W.2d 570 (1956), the employee sustained injuries to his head while working as a laborer. The employee testified that a shovel which was being used in the lead-smelting procedure struck him in the head, knocking him unconscious and to the floor and causing him injuries. There was evidence that the employee had experienced episodes of unconsciousness suggestive of epilepsy in the past, and one physician testified that the employee had given a history which " 'strongly suggests that the patient fell spontaneously from some cause within himself. . . .' " *Id.* at 334, 79 N.W.2d at 573. The Supreme Court affirmed the judgment of the Workers' Compensation Court, finding that the employee had failed to meet his burden of proof and noting that awards of compensation may not be based on possibilities, probabilities, or speculative evidence. Specifically, the Supreme Court determined that the preponderance of the evidence established that the employee's injuries were caused by "some physical reaction within himself which suddenly felled him backward and down, causing his head to strike the concrete floor." *Id.* at 336, 79 N.W.2d at 574.

In *Scott v. Young Men's Christian Assn.*, 195 Neb. 746, 240 N.W.2d 587 (1976), the employee worked as a custodian for the Young Men's Christian Association (YMCA). His body was

found one evening lying at the bottom of a filled swimming pool located in the YMCA building. The cause of death was drowning, but shortly before death, the employee had suffered "backward heart failure." *Id.* at 749, 240 N.W.2d at 588. The employer claimed the employee fell into the pool because of his heart condition. The plaintiff claimed that the employee merely slipped and fell into the pool and then drowned, suffering the heart failure as a result. There were no witnesses to the fall. Noting that the cause of the employee's fall was a close question, the Supreme Court affirmed the award of compensation. It specifically stated that the employee's good state of health and lack of prior difficulties stemming from his heart condition justified the inference, and the lower court's finding, that the cause of the fall was accidental rather than idiopathic. It is important to note that the court in *Scott* did not expressly state that if the cause of the fall was idiopathic, the death was not compensable. Indeed, it took special note of the fact that the employee, a nonswimmer, was placed at "special risk" working around a body of water where slippery walkways were a fact of life.

None of these cases involved pure unexplained falls as characterized by Professor Larson. In each, there was evidence of possible idiopathic origins to the fall. Only in *Scott* was there a suggestion that the employment placed the employee in a position to increase the effects of a fall, but since the case was decided on the theory that the fall was not idiopathic, the rule of compensability of idiopathic-fall injuries espoused by Professor Larson was not at issue.

As stated above, we interpret the trial court's findings to be that Duane simply failed to prove, beyond speculation or guess, exactly why, how, or where Marjorie sustained the injury leading to her death. The trial court's finding that it was "as likely" that Marjorie fell from gait instability as it was that she tripped and fell on the premises is reminiscent of the language selected by the Supreme Court in *Cochran v. Bellevue Bridge Commission*, 174 Neb. 761, 119 N.W.2d 292 (1963), that the employee "could" have fallen as a result of his heart condition. Applying the rationale of *Cochran*, and deferring as we must to the trial court's findings which are supported by the evidence, the trial court properly found that Duane had failed to meet his

burden of proof by a preponderance of the evidence that Marjorie's death arose out of her employment with Colonial Manor.

However, even if we were to interpret the trial judge's findings to be that Marjorie's fall was, in fact, caused from idiopathic conditions, the conclusion that Duane failed to sustain his burden of proof was still correct. There is no evidence Marjorie's employment placed her in a position of increasing the effects of an idiopathic fall, a predicate to compensability under the rule stated above. See 1 Larson & Larson, *supra*, § 12.00. Indeed, Duane seems to argue that he need not show such an increased risk to prevail. We believe his reliance on the positional risk doctrine in this context is misplaced. As is apparent from our earlier discussion, even Professor Larson, upon whom Duane so heavily relies, does not suggest that the arising-out-of requirement be presumed in idiopathic-fall cases.

Based on the foregoing, the judgment of the Workers' Compensation Court review panel must be affirmed. Because we reach this conclusion, even giving due consideration to Marjorie's statements to Duane, we need not determine the issue raised by Colonial Manor in its cross-appeal, that is, whether these statements constituted hearsay and whether they were properly admitted. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court need not engage in analysis which is not needed to adjudicate case and controversy before it).

## CONCLUSION

The finding of the Workers' Compensation Court trial judge that Marjorie's fall could have been caused by her idiopathic condition has support in the evidence. The "unexplained fall rule," even if deemed a corollary to the positional risk doctrine applied in *Nippert v. Shinn Farm Constr. Co.*, 223 Neb. 236, 388 N.W.2d 820 (1986), is not applicable when there is evidence of a possible idiopathic origin to the fall. The trial court's finding that Duane failed to show by a preponderance of the evidence that Marjorie's death was caused by an accident arising out of her employment with Colonial Manor is not clearly erroneous. The review panel's affirmance of the trial court's order of dismissal is therefore affirmed.

AFFIRMED.