STATE OF NEBRASKA, APPELLEE, V. ABE CLARK LYTLE, APPELLANT.

231 N. W. 2d 681

Filed July 24, 1975. No. 39681.

Frank B. Morrison and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and Gary B. Schneider, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, Mc-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

This is an appeal from defendant Abe Clark Lytle's conviction after a jury trial of first-degree murder arising out of a purse snatching and assault under the felony-murder rule. Defendant was sentenced to imprisonment for life.

Defendant alleges five assignments of error: (1) The failure to suppress his confession for the reason that his arrest was unlawful and without probable cause; (2) the failure to suppress his confession, because of his minority he did not knowingly, intelligently, and voluntarily waive his constitutional rights; (3) the limitation of the cross-examination of defense counsel; (4) the overruling of defendant's plea in abatement; and (5) the denial of defendant's motion for a directed verdict because the evidence was insufficient as a matter of law to prove corpus delicti and defendant's guilt beyond a reasonable doubt. We affirm.

The evidence permitted the jury to find that on the evening of October 28, 1973, Camille Hugg, age 81, was a victim of an attempted purse snatch by the defendant and one Joseph Hayes Harris. She resisted, clung to her purse, was knocked to the ground by her assailants, and was kicked and stomped. She suffered a broken hip, either from the fall or the blows. She was hospitalized, surgery was performed, and a pin inserted in the hip. She died on December 17, 1973, without having been released from the hospital. The defendants were tried separately. Harris' conviction was affirmed June 5, 1975. State v. Harris, *ante* p. 74, 230 N. W. 2d 203.

We consider first defendant's fifth assignment of error, because it is the one defense common to both the defendant and to Harris. Defendant concedes the attempted robbery of the victim, the kicking and stomping of her by Harris, and the defendant's striking her in the chest.

Defendant, however, argues the proximate cause of death was the complications occasioned by the surgical procedure used to treat the victim's hip and that these complications arose independently of the injury to the hip itself.

We briefly summarize the facts pertinent to this issue. After the assault, Mrs. Hugg was taken to the Douglas County Hospital emergency room where she was treated by Doctor Thomas Tomczak, who diagnosed her condition as a fractured hip. An examination of her the next day showed some abnormal heart beats which could have been due to stress caused by the injury. Mrs. Hugg's personal physician, Doctor Thomas Gurnett, testified that as of July 1971, when he last examined Mrs. Hugg, who had been a nurse, she had minor intestinal, blood pressure, and skin problems, as well as diabetes, but was otherwise normal for a patient of her age. He served as her treating physician from October 31, 1973, until her death. He diagnosed her injury as an intertrochanteric fracture of the hip and a possible fracture of the sternum, which caused a respiration problem because of pain and tenderness. After consultation with an orthopedic surgeon, an operation was performed which consisted of nailing the two pieces of the hip together in order to immobilize it. After the surgery was performed, Mrs. Hugg began suffering from post-operative complications. Her heart action became irregular, medication was prescribed to control that situation, and anticoagulants were administered to prevent blood clotting. Doctor Gurnett considered the operation a success, and the patient was mobile and sitting up on several occasions after surgery.

As a result of the medication, the patient's heart became regular within 36 hours. However, other complications set in. Blood clots were forming, but the use of anticoagulants had to be halted because Mrs. Hugg was developing a stress ulcer—a localized, punched-out area in the lining of her stomach—which became apparent

on November 13, 1973. Doctor Gurnett was of the opinion that these conditions arose as the result of the hip injury and the surgery. At times Mrs. Hugg was unable to consume food orally and was given blood transfusions as a result of the ulcer. There were spells during this period when she became incoherent and confused. Her condition deteriorated progressively thereafter. By November 16, her internal bleeding had stopped but her heart beat had become irregular. On November 22, her heart rate was rapid and irregular. This required more medication. On November 27, she complained of chest pain and breathing difficulty which Doctor Gurnett diagnosed as a blood clot breaking loose from the lower extremities and striking the left lung. On December 7, Mrs. Hugg complained of abdominal pain and diarrhea and a staph infection in her saliva gland developed, requiring treatment. At this point, her condition was deteriorating rapidly. She was loosing strength and her blood pressure and vital signs were no longer normal. She died on December 17, 1973.

Doctor Gurnett testified, based on reasonable medical certainty: "I believe Mrs. Camille Hugg's death was caused by a fracture of the hip and the complications that followed directly in the wake of that fracture of the hip." In response to a question as to whether Mrs. Hugg died from a heart attack, the doctor testified: "I believe my testimony was that these complications with the shock, in the wake of the injury that the patient received, were complications directly as a result of those injuries, and they were terminal events."

Defendant argues that a new and independent intervening cause occurred between the time of defendant's acts and the death of Mrs. Hugg. He argues that his actions in causing the hip fracture were not the proximate cause of the death. Rather, death was due to the intervention of severe infection and complications arising out of the doctor's undertaking the surgical procedures over nonsurgical means of treatment. There is no

evidence in the record in any form, even by way of inference, that Mrs. Hugg would have recovered had the operation not been performed.

The opinion of the doctor was premised on his treatment and personal observation of Mrs. Hugg on a daily basis, from her admission to St. Joseph's Hospital to the date of her death. It would appear that the evidence raised a factual question for the jury to determine under proper instructions from the court, whether the victim's death was caused by acts of the accused or by independent, intervening acts or causes. Our holding in State v. Harris, *ante* p. 74, 230 N. W. 2d 203, where we dealt with this same issue, is controlling herein. We there said: "In a prosecution for homicide the act of the accused must be a proximate cause of death but need not be the direct, immediate cause. It is sufficient if the direct cause resulted naturally from the act of the accused, as where the direct cause was a disease or infection resulting from the injury inflicted by the accused. * * *

"In a prosecution for homicide it is not a defense to one whose act has contributed to the death that improper treatment on the part of physicians, nurses, or the victim also contributed thereto; but one who has inflicted an injury is not responsible for homicide where death results solely from erroneous treatment by another. * * *

"The proximate cause of a death is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the death, and without which the result would not have occurred. It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the death. * * *

"An efficient intervening cause is a new and independent cause, itself a proximate cause of the death, which breaks the causal connection between the original illegal act and the death."

Defendant's first assignment of error is raised for the first time in this court. Defendant is contending his

arrest was illegal because it was not based upon probable cause, and therefore his subsequent confession should not be admissible as evidence against him. Defendant at no time in the trial below raised any question as to the legality of his arrest. A Miranda hearing, as it was referred to in the transcript, was held on March 28, 1974, to determine the admissibility of the defendant's confession. At this hearing, defendant only questioned the voluntariness of his confession, the intelligence of his waiver, and the adequacy of the Miranda warnings. Defendant in no way challenged the legality of his arrest. At the trial, defendant did not object to the introduction of the confession because the prior arrest was allegedly illegal. Finally, defendant's motion for a new trial not only does not contain any reference to the alleged illegality of the arrest, it does not contain any reference whatsoever to the allegedly erroneous admission of the confession into evidence.

We have repeatedly said that alleged errors not raised in the trial court and not referred to in a motion for a new trial will not be considered by this court on appeal. In order to obtain a review of alleged errors occurring during the trial, such errors must be pointed out to the trial court in a motion for a new trial and a ruling thereon obtained. State v. Temple (1974), 192 Neb. 442, 222 N. W. 2d 356. The twofold purpose of this requirement was set out in State v. Burnside (1970), 185 Neb. 234, 175 N. W. 2d 1: "Ordinarily, preliminary to an appeal, assigned errors must be presented to and ruled upon by the trial court. This serves a twofold purpose. It affords opportunity for the trial court to correct its own errors and often enables a litigant to make a record upon which to found an appeal."

Further, there was no record made focusing upon the question of probable cause for arrest. Defendant now complains because the record allegedly does not contain an affirmative showing of probable cause for arrest. In State v. Erving (1966), 180 Neb. 824, 146 N. W. 2d

216, we said: "The defendant's contention that his arrest was illegal is based upon the absence of a showing in the record rather than an affirmative showing that grounds for his arrest did not exist. The legality of the arrest was not an issue in the case until the appeal to this court. Under such circumstances this court will not assume that probable cause for the arrest of the defendant did not exist at the time it was made."

Actually, probable cause did exist. It is undisputed that defendant was arrested somewhere around 1:30 a.m., on December 28, 1973. Between 5 p.m. on December 27, 1973, and 1:30 a.m. on December 28, 1973, police officers had interviewed Joseph Harris and had taken a statement from him regarding his involvement, along with the defendant, in the purse snatching on October 28, 1973. It was this statement of Harris, implicating the defendant, which gave the officers probable cause to arrest the defendant. This statement provided reasonably trustworthy information which would warrant a man of reasonable caution in the belief that defendant was involved in the commission of the crime. The officers could reasonably believe the information was trustworthy because it came from a statement which implicated the maker as well as the defendant.

Defendant's second assignment of error is premised on the argument that because of his minority, his confession must be viewed in a different perspective than that of an adult. Defendant at the time of the confession was 3 days from being 18 years of age. Minority is simply another factor to be considered in determining voluntariness, and there is no distinct or separate rule of evidence applicable to the confession of minors. It is elementary that a confession, in order to be admissible in evidence against its maker, must be voluntarily made with knowledge of the maker's constitutional rights, or in other words his rights must be voluntarily and intelligently waived. Miranda v. Arizona (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

The following from Schneckloth v. Bustamonte (1973), 412 U. S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854, is pertinent in this area: "This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty. The Due Process Clause does not mandate that the police forego all questioning, or that they be given carte blanche to extract what they can from a suspect. 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' Culombe v. Connecticut, supra, at 602.

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding curcumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, e.g., Haley v. Ohio, 332 U. S. 596; his lack of education, e.g., Payne v. Arkansas, 356 U. S. 560; or his low intelligence, e.g., Fikes v. Alabama, 352 U. S. 191; the lack of any advice to the accused of his constitutional rights, e.g., Davis v. North Carolina, 384 U. S. 737; the length of detention, e.g., Chambers v. Florida, supra; the repeated and prolonged nature of the questioning, e.g., Ashcraft v. Tennessee, 322 U. S. 143; and the use of physical punishment such as the deprivation of food or sleep, e.g., Reck v. Pate, 367 U. S. 433. In all of these cases the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. Culombe v. Connecticut, supra, at 603.

"The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See Miranda v. Arizona, 384 U. S. 436, 508 (Harlan, J., dissenting); id., at 534-535 (White, J., dissenting)."

Testing the voluntariness in this manner, it is clear that defendant's confession was voluntary and therefore admissible. Defendant was 3 days from reaching his 18th birthday. He was informed of his constitutional rights, both formally and informally before he made any statement, and he voluntarily waived them. The record indicates the police officers treated the defendant with courtesy and respect and no attempt was made to coerce a confession, either physically or mentally. Defendant confessed after a very short period of questioning. As the trial court and the jury found, the defendant's confession was the product of an essentially free and unconstrained choice. The fact that defendant was 3 days from his 18th birthday is not sufficient in and of itself to vitiate his confession.

Defendant's third assignment of error, that the court erred in limiting the cross-examination of defense counsel, is not properly before us. Defendant's motion for a new trial does not contain any reference to this assignment. What we said relative to defendant's first assignment of error disposes of this assignment. In passing, however, we note that it is quite obvious from the exchange quoted between the court and defendant's counsel that the trial court was merely precluding defendant from arguing to the jury through his questions as well as from asking for repetitive and cumulative testimony. The rule is well established in this jurisdiction that the scope of cross-examination of a witness rests largely in the discretion of the trial court and its ruling will be upheld on appeal unless there is an abuse of discretion. State v. Coleman (1971), 186 Neb. 571, 184 N. W. 2d 732.

Defendant's fourth assignment of error challenges as a violation of due process the county attorney's discretion whether to charge the defendant, who was 3 days from 18 years of age at the time the confession was given, as an adult or juvenile. The constitutional issue raised by defendant's plea in abatement was decided adversely to the defendant in State v. Grayer (1974), 191 Neb. 523, 215 N. W. 2d 859. There the defendant was 15 years of age. In that case we said: "The constitutional questions raised are readily answerable. In DeBacker v. Sigler, 185 Neb. 352, 175 N. W. 2d 912, this court held that vesting in the county attorney a discretionary power to proceed against juveniles in the juvenile or criminal courts was not an unconstitutional practice and did not violate the precepts of due process. The question was before the court in United States v. Bland, 472 F. 2d 1329 (1972), and Cox v. United States, 473 F. 2d 334 (1973). Both cases dealt with a similar discretion vested in the Attorney General of the United States under federal statutes. Both cases hold: 'Congress could reasonably vest in Attorney General, rather than in a judge in a judicial proceeding, the responsibility of deciding whether or not to prosecute a juvenile as an adult.' Cox v. United States, supra. The Bland case specifically states that such discretion does not violate due process. * * *

"The assertion that one under 16 years of age *must* be referred to the juvenile court was answered in Fugate v. Ronin, 167 Neb. 70, 91 N. W. 2d 240, wherein this court held in the case of a 14-year-old defendant that: 'A careful study of the act clearly indicates it is not intended the juvenile court shall have exclusive jurisdiction and control of all juveniles. * * * "Juvenile courts do not have the sole or exclusive jurisdiction of children under eighteen years of age who have violated our laws." ' See, also, Kennedy v. Sigler, 397 F. 2d 556 (8th

Cir., 1968), which arrives at the same result in a similar case."

The 1974 Legislature amended the Juvenile Court Act to require the county attorney to attach an affidavit with his complaint, setting forth his decision, and that he had considered certain criteria. The effective date of this act was July 12, 1974. Defendant's trial had been concluded the previous month. His notice of appeal herein was filed July 8, 1974, or 4 days before the effective date of the act. The defendant now asserts that the court should require the prosecuting attorney to file an affidavit that he followed the prescribed standards in determining in which court to charge the defendant. This is frivolous to the extreme. Defendant argues that the prosecuting attorney should file an affidavit that he followed standards which the law did not require him to follow at the time the complaint was filed.

There is no merit in any of the defendant's assignments of error. The judgment is affirmed.

AFFIRMED.