STATE OF NEBRASKA, APPELLEE, V. SUSANA MURO, ALSO KNOWN AS SUSANA MURO ANDRADE, APPELLANT.
688 N.W.2d 148

Filed November 2, 2004.    No. A-03-1399.

Derek L. Mitchell for appellant.

Jon Bruning, Attorney General, James H. Spears, and Danielle C. Miller, Senior Certified Law Student, for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

IRWIN, Chief Judge.

## I. INTRODUCTION

Susana Muro, also known as Susana Muro Andrade, appeals the decision of the district court for Dawson County, Nebraska, convicting her of the crime of child abuse resulting in the death of a child, a Class IB felony, and sentencing her to 20 years' imprisonment. On appeal, Muro challenges the sufficiency of the evidence to sustain the conviction and asserts that the sentence imposed was excessive. We find that the evidence supports a finding that Muro's child suffered an injury which was not invariably fatal and which the child had a reasonable likelihood of surviving but for Muro's failure to seek timely medical treatment. The evidence supports the trial court's finding that Muro possessed the requisite state of mind, that Muro failed to provide

necessary care to her child, and that Muro's failure to seek timely medical treatment was a proximate cause of the child's death. Consequently, we find the evidence sufficient to support the trial court's conviction. We also find that the sentence imposed was not excessive. We affirm.

## II. BACKGROUND

The events which gave rise to this criminal proceeding occurred on the evening of October 27, 2002, in or around Lexington, Nebraska. On that date, Muro's 8-month-old daughter, Vivianna Muro, suffered a serious injury and ultimately died. The criminal prosecution in this case was based on assertions that Muro failed to timely seek medical care for Vivianna and that such failure to seek medical care was a proximate cause of Vivianna's death. Although the testimony at trial contained some discrepancies concerning the specific details of what occurred on October 27, we view and construe the properly admitted evidence in a light most favorable to the State. See *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004).

On October 27, 2002, Muro left her house at approximately 3:20 p.m., leaving Vivianna and Muro's 4-year-old son, Jose Muro, Jr. (Junior), with their father, Muro's husband, Jose Muro (Jose). When Muro left, Vivianna appeared normal. At trial, evidence was presented that Vivianna had been crying after Muro left and that Junior had asked Jose to get Vivianna to stop crying. Further evidence was presented that Vivianna did not stop crying and that Jose "hit Vivianna" and "threw" Vivianna. Prior to trial, Junior had demonstrated to a police investigator that Jose had hit Vivianna with his hand on the left side of her head and had held Vivianna by the leg and thrown her. Junior had also commented to the investigator "about [Vivianna's] hitting glass and [that] the glass exploded."

Muro returned home after 6 p.m. and observed that Jose was holding Vivianna. According to Muro, Vivianna would normally cry when Jose held her but was not crying when Muro arrived. Muro asked Jose how Vivianna was, and Jose replied that Vivianna was asleep. Muro then gave Junior some cereal and put groceries away, and Jose placed Vivianna in her crib.

Muro next gave Junior a haircut and a bath and took a shower. Between 7 and 7:30 p.m., Muro picked up Vivianna, "called her

name, then . . . ran towards [Jose]." Muro told Jose, " '[S]ome-
thing's wrong with the baby.' " At that time, Vivianna appeared
"loose" and "dazed." Muro later described to a police investiga-
tor that Vivianna's eyes were "half open, half closed," and that
Vivianna was unresponsive and "limp, kind of like a rag doll."

Jose took Vivianna from Muro and began using a nasal aspi-
rator to clear Vivianna's nose and mouth. Jose called Tri-County
Hospital in Lexington sometime after 8:30 p.m. The record does
not indicate that Jose provided any identification when he called
the hospital. At trial, Muro testified that the hospital advised Jose
to keep Vivianna warm. Kathleen Goracke, a registered nurse
who was on duty at Tri-County Hospital on that night, testified
that she received a telephone call about a baby from an unidenti-
fied male between 8:10 and 8:30 p.m., that the caller did not
advise her that the baby was limp or unresponsive, that the caller
advised her that the baby was just waking up and seemed " 'wob-
bly,' " and that the caller expressed concern that the baby had
"ingested some poison." Goracke testified that she advised the
caller to allow the baby to fully wake, to observe the baby, and to
bring the baby in to the emergency room if he had any concerns.

Muro testified that after Jose called the hospital, she changed
Vivianna's diaper and clothes. Muro testified that she then called
the hospital herself but, like Jose, remained unidentified. Muro
claims that she informed the person she spoke with at the hospi-
tal that Vivianna looked "dazed." Muro claims that the person she
spoke with advised her to continue using the aspirator and to
keep Vivianna warm. Muro also claims that the person she spoke
with told her that " '[i]t's probably a flu or a virus that's going
around.' " Goracke testified that the only telephone call received
in the emergency room on the night in question besides the un-
identified male's was from an unidentified female, but that her
call came prior to the unidentified male's. Goracke testified that
the female caller contacted the hospital at approximately 6:15
p.m. Goracke further testified that she did not advise anyone that
there was a flu going around and that she had also advised the
female caller to bring her baby in if she had any other questions
or problems or was unsure.

Muro then called her mother-in-law, who resides in California.
Muro told her mother-in-law that Muro's " 'friend's . . . baby' "

was " 'dazed' " and looked " 'loose.' " When Muro's mother-in-law asked whether Muro was talking about Vivianna, Muro specifically told her, " 'No.' " Muro's mother-in-law advised Muro to " '[t]ell [her] friend to take the baby to the hospital as soon [as] she can.' " Muro then took Vivianna to the hospital.

At approximately 11 p.m., Muro, Jose, Junior, and Vivianna arrived at Tri-County Hospital. Jose carried Vivianna into the emergency room, at which time she was unresponsive, "real limp and cold," and "kind of . . . gray-bluish looking." Vivianna was not breathing when she arrived at the hospital. Additionally, there was no fontanel present in Vivianna's skull area; the soft spot on her head was "very much bulging." Goracke started "mouth-to-mouth breathing" and was joined in the emergency room by two other nurses who helped attempt to resuscitate Vivianna.

Goracke testified at trial that when Vivianna arrived at the hospital, her pupils were fixed and dilated and she had a "really bad rash" in her diaper area, an "open area" cut on her neck which was oozing, "scabs and scratches and marks all over," unkempt feet and toenails, new and old sores on her hands and feet, another "open area" on her right armpit, "scratches all over" her body, and "bruises" on her left side.

To resuscitate her, personnel at Tri-County Hospital "shocked [Vivianna] four times, and [she] went into a sinus breathing rate." Although Vivianna was revived to the point of having a heartbeat, she "was unresponsive the whole time, and there was no spontaneous respiration." Dr. Joseph Miller was the physician on call in the emergency room that night, and at trial, he testified that Vivianna was never stabilized. Dr. Miller testified that Vivianna had a hematoma, or a collection of blood, on the left side of her head; that her " 'soft spot' " was bulging; and that her eyes were fixed and dilated. Dr. Miller further opined that "there had been some probable brain damage." Vivianna failed to react even to painful stimuli, such as the starting of an intravenous line and the insertion of stomach and nasogastric tubes. A chest x ray also revealed an "old, fractured, right sixth rib . . . which is very unusual for a child."

Personnel at Tri-County Hospital then contacted Good Samaritan Hospital in Kearney, Nebraska, to arrange a transfer of Vivianna because they believed that Vivianna "needed more care

than what [they] could, on-going, give at Tri-County Hospital." Dr. Stephen Parys was the treating physician from Good Samaritan Hospital who accompanied Vivianna during the transfer. Dr. Parys also noted the fractured rib that was apparent on Vivianna's chest x ray, the bruises on her leg and chest, the hematoma on the left side of her head, and that her fontanel area was bulging and tense.

Once Vivianna arrived at Good Samaritan Hospital, hospital personnel performed a CT scan to determine whether Vivianna had suffered any injuries to her brain. The CT scan revealed a "slightly displaced skull fracture in the left parietal area with a hematoma over it." At trial, Dr. Parys testified that "[i]t usually takes a significant force to cause a fracture to the skull" such as the one suffered by Vivianna. Dr. Parys recalled that when he spoke to Muro and Jose about Vivianna's condition, they told him that Vivianna had suffered "no traumas or accidents that day." According to Dr. Parys, Muro and Jose informed him that they first noticed that Vivianna was not well "mid-afternoon."

After performing other medical tests on the night in question, Dr. Parys determined that Vivianna was brain dead. Dr. Parys informed Muro and Jose that "the chance for survival was zero," and they discussed removing Vivianna's life support. Muro and Jose agreed to remove Vivianna from life support. Vivianna died a short time later.

An investigator with the Lexington Police Department transported Vivianna's body from Good Samaritan Hospital to the Douglas County coroner's office in Omaha, Nebraska, on the evening of October 28, 2002. Dr. Blaine Roffman performed the autopsy on Vivianna. Dr. Roffman noted various indications that Vivianna had suffered trauma, including torn skin over the right lateral thorax and the left anterior thorax, broken and hemorrhaged fingernails, recent bruising of the right side of the neck and the midline of the forehead, bruising to "the left of the oral cavity on the cheek," and a fracture of the left temporal bone of Vivianna's skull. At trial, Dr. Roffman ultimately opined that the cause of death was "a fracture of the left parietal skull [above the left ear], which resulted in cerebral edema [swelling], which resulted in brain death."

On November 19, 2002, Muro was charged by information with felony child abuse. On December 6, Muro stood mute at arraignment and the court entered a plea of not guilty on her behalf.

A bench trial was conducted on October 8 and 9, 2003. During the course of the bench trial, the State presented evidence generally establishing the chronological course of events as set forth above. The State's evidence indicated that the State's theory at trial was that Muro had failed to seek medical treatment for Vivianna in a timely fashion and that her failure to seek such medical treatment for Vivianna's injuries and condition was a proximate cause of Vivianna's death.

To that end, the State presented medical testimony from the treating physicians, the autopsy physician, and from a nationally recognized child abuse expert. The specifics of that testimony will be set forth in more detail in the analysis portion of this opinion below, but that testimony generally established that if medical treatment had been sought at an earlier time, Vivianna would have had a chance to survive the injuries, but that because of the delay in seeking treatment, Vivianna was not able to survive once treatment was finally sought.

On October 14, 2003, the court entered an order finding Muro guilty of the charged crime. The court specifically found Muro to have known no later than 7:30 p.m. that something was seriously wrong with Vivianna and that Vivianna needed care that Muro could not provide. The court specifically found that Muro's assertions that she did not know how serious the condition was were not credible. The court further found that Muro knowingly and intentionally failed to provide necessary care, that Vivianna's condition worsened as a result, and that the worsening of her condition ultimately led to her death. The court specifically found that Muro's deprivation of care for Vivianna contributed in a natural and continuous sequence to Vivianna's death.

On November 21, 2003, the court sentenced Muro. The court found that the applicable range of sentences, according to Neb. Rev. Stat. § 28-105 (Cum. Supp. 2002), was 20 years' to life imprisonment. The court specifically found that granting Muro probation would depreciate the seriousness of the crime and promote disrespect for the law. After considering all relevant factors,

the court sentenced Muro to the statutory minimum of 20 years' imprisonment. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Muro asserts, restated, that the district court erred in two respects. First, Muro asserts that the court erred in finding sufficient evidence to sustain a conviction on the charged crime. Second, Muro asserts that the court erred in imposing an excessive sentence and in finding that she was not a suitable candidate for probation.

## IV. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Muro first asserts that the district court erred in finding sufficient evidence to sustain a conviction on the charged crime. We find that the evidence in the record, when viewed and construed in a light most favorable to the State, supports the district court's finding that each element of the charged crime was proven. The evidence is sufficient to support a finding that Muro knowingly and intentionally failed to provide Vivianna necessary care and attention and that such failure was a proximate cause of Vivianna's death.

### (a) Standard of Review

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless

clearly erroneous, an appellate court has an obligation to reach an independent, correct conclusion regarding questions of law. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

### (b) Required Elements

Muro was charged with Class IB felony child abuse under Neb. Rev. Stat. § 28-707 (Cum. Supp. 2002), which provides, in relevant part:

> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
>
> (a) Placed in a situation that endangers his or her life or physical or mental health;
>
> . . . .
>
> (c) Deprived of necessary food, clothing, shelter, or care[.]
>
> . . . .
>
> (6) Child abuse is a Class IB felony if the offense is committed knowingly and intentionally and results in the death of such child.

The trial court found that the State had proven beyond a reasonable doubt that Muro knowingly and intentionally placed Vivianna in a situation that endangered her life and resulted in her death. Because the trial court determined that Muro's behavior was knowing and intentional, the offense is a felony, rather than the misdemeanor it would be had her behavior been found to have been only negligent. The proscribed conduct for felony and misdemeanor child abuse is exactly the same; it is the actor's state of mind which differentiates the offenses. *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998). As such, the required elements of the charged crime include that Muro's state of mind was knowing and intentional, that Muro's conduct resulted in Vivianna's being placed in a dangerous situation or being deprived of necessary care, and proximate causation.

### (c) State of Mind

Muro first argues that she had not had the required state of mind to support a conviction for felony child abuse, because she did not knowingly or intentionally deprive Vivianna of necessary care. Muro argues that her testimony on cross-examination

and her prior statements establish that she did not know the seriousness of Vivianna's condition until the time of trial and that therefore, she could not have deprived Vivianna of care either knowingly or intentionally. We conclude, however, that the evidence, viewed in a light most favorable to the State, supports the trial court's finding that Muro knowingly and intentionally failed to provide medical care for Vivianna after the seriousness of Vivianna's condition did in fact become apparent and known to Muro.

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *Id.* See *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

Muro testified in her own defense at trial, and the record contains a detailed account of Muro's version of the events which occurred on the evening of October 27, 2002, before Vivianna arrived at Tri-County Hospital. Muro testified under cross-examination that she did not know that Vivianna's condition was serious. However, the trial court is not bound to accept that statement and, in fact, specifically found that Muro was not credible.

Muro's claim that she did not know the seriousness of Vivianna's condition must be weighed against the other evidence in the record, much of which is more objective evidence. For example, the record contains numerous discrepancies in the timeline of events that Muro reported to physicians treating Vivianna, police investigating the case, and the court at trial. The record also contains evidence that Muro or Jose placed three telephone calls, purportedly seeking help for Vivianna but each time concealing the identity of the parents and child, even when directly asked by Muro's mother-in-law. There is also evidence that Muro did not fully disclose Vivianna's condition when she called the hospital, and there is evidence from the hospital disputing that Muro was given the advice she alleges she was given.

Vivianna's condition while still at Muro's residence was obviously dire, even as described by Muro. Muro herself noted that

Vivianna was unresponsive, limp, and dazed in appearance for a significant period of time before Muro took her to the hospital. Dr. Randell Alexander, a child abuse expert who testified in behalf of the State, testified that Vivianna's symptoms after 7 p.m. were consistent with a severe head injury and that the symptoms would be readily observable by anyone who "interacted at all with [Vivianna]." Further, the medical testimony at trial indicated that Vivianna had significant signs of trauma, including numerous bruises and scratches, which were readily observable.

By the time Muro did take Vivianna to Tri-County Hospital for care, Vivianna was not breathing, was entirely unresponsive, was bluish in color, and had fixed and dilated pupils. The inference is readily supportable when viewing the evidence most favorably to the State that Muro knowingly and intentionally failed to provide necessary medical care for Vivianna after Vivianna's condition and its seriousness did become readily apparent to Muro. Therefore, the evidence was sufficient to support the trial court's finding that Muro knowingly and intentionally failed to provide Vivianna necessary care and protection, and Muro's arguments to the contrary are without merit.

### (d) Prior Knowledge

Muro also argues that the trial court had no evidence before it that shows that she knowingly and intentionally placed Vivianna in a dangerous situation when she left Vivianna with Jose, because there was no evidence to indicate that she had prior knowledge of any injuries Vivianna had sustained before October 27, 2002. Muro claims that she had no reason to be concerned about leaving Vivianna alone with Jose, because she did not suspect prior abuse. We find this lack of evidence to be irrelevant, however, because the State's evidence and the trial court's findings both focus primarily on Muro's failure to provide necessary care, not on her placing Vivianna in a dangerous situation.

Section 28-707 provides that child abuse can be committed in a number of ways, including causing the child to be placed in a dangerous situation or depriving the child of necessary care. Muro misconstrues the import of the State's evidence, as well as the trial court's detailed findings, both of which mainly revolve around her failure to provide necessary care. The trial court

specifically found that Muro "knowingly and intentionally did not provide [Vivianna] with necessary care." As such, it is apparent that the knowing and intentional state of mind which Muro was found to have possessed was in relation to Muro's perception, as early as 7:30 p.m., that there was something seriously wrong with Vivianna, yet depriving Vivianna of necessary medical treatment until after 11 p.m., not in relation to her leaving Vivianna in Jose's care earlier in the day. Hence, we need not further address Muro's argument in this regard.

### (e) Causation

Muro argues that any acts or omissions that she was accused of did not result in the death of Vivianna. Muro argues, in essence, that the State failed to demonstrate causation because the State failed to adduce sufficient evidence, given with reasonable medical certainty, that Vivianna would have survived if she had received medical treatment at an earlier time. Viewing the evidence in a light most favorable to the State, we do not find the court's finding on causation to be clearly wrong.

As noted above, on appellate review, the evidence is viewed in a light most favorable to the prosecution. See, *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004); *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). Further, in a bench trial of a criminal case, the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). As such, the issue presented by this assertion of error is whether the evidence, viewed in a light most favorable to the prosecution, supports the court's finding of causation to the extent that such finding is not clearly erroneous.

■ The Nebraska Supreme Court enunciated the principles of law governing proximate cause in criminal matters in *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989). In that case, the defendant motorcyclist's passenger was killed after the defendant fled from a police officer attempting to stop him. During the course of his flight, the defendant committed a number of violations, such as speeding and running stop signs. The court discussed the general principles of proximate cause, saying:

Proximate cause has been defined by this court as "a moving or effective cause or fault which, in the natural and

continuous sequence, unbroken by an efficient intervening cause, produces the death and without which the death would not have occurred." *State v. Sommers*, 201 Neb. 809, 811-12, 272 N.W.2d 367, 369 (1978). " 'It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the death . . . .' " *State v. Lytle*, 194 Neb. 353, 358, 231 N.W.2d 681, 685 (1975); *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975).

*State v. William*, 231 Neb. at 88, 435 N.W.2d at 177.

▆▆ Similarly, the appellate courts in this state have previously held that proving that a defendant's conduct was a proximate cause necessarily proves that another cause (intervening or superseding cause) was not the sole proximate cause. *State v. Bartlett*, 3 Neb. App. 218, 525 N.W.2d 237 (1994). As such, the question is whether a defendant's act, or violation of law, as the case may be, was *a* contributing factor to the death or *a* proximate cause thereof. See, *State v. Rotella*, 196 Neb. 741, 246 N.W.2d 74 (1976); *Hoffman v. State*, 162 Neb. 806, 77 N.W.2d 592 (1956); *Vaca v. State*, 150 Neb. 516, 34 N.W.2d 873 (1948). The Nebraska Supreme Court has stated that proximate cause in criminal cases involving death means "a moving and effective cause or fault which, in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the death and without which the death would not have occurred." *State v. Sommers*, 201 Neb. 809, 811-12, 272 N.W.2d 367, 369 (1978).

Taking these propositions of law together, we are left to determine whether, viewing the evidence in a light most favorable to the prosecution, the court was clearly erroneous in finding that Muro's failure to seek medical treatment for Vivianna was a proximate cause of her death. In other words, does the evidence support a finding that Vivianna's death would not have occurred had Muro not failed to seek medical treatment for Vivianna? We conclude that the evidence does support such a finding.

Dr. Alexander, who holds a medical degree with specialization in pediatrics as well as a Ph.D. in experimental psychology, testified as an expert in child abuse. Dr. Alexander has extensive experience working with severe head injuries to children, plus considerable focus on the forensics of child abuse. Dr. Alexander's testimony about his credentials, his experience, and

his review of the medical evidence in the present case was extensive and detailed, and no challenge was raised to his expertise in these matters.

Dr. Alexander opined that Vivianna was a victim of repeated and severe physical abuse as shown by the evidence of multiple rib fractures in different stages of healing. He testified that she had suffered an abusive head injury, including a skull fracture, and that there was strong evidence of a shaking component in her head trauma. He cited evidence that the head trauma was present at least by 7 p.m., at which time Vivianna was limp. The evidence establishes that Muro did not seek medical treatment for Vivianna until approximately 11 p.m., at least 4 hours after the head trauma was present.

Dr. Alexander indicated that there was a delay in securing medical treatment despite serious symptoms. He testified that "if there was an opportunity to have intervened and maybe staved off total death, it was too late by the time [Vivianna] finally did get care." When asked whether there was "an opportunity," presumably for effective medical intervention, he testified that there had been such an opportunity. He reasoned that the 4-hour period from the onset of symptoms to the time when Vivianna was taken to Tri-County Hospital at approximately 11 p.m. was a long time for a child to survive a head injury and was not typical. Dr. Alexander testified that he was unable to put a percentage on the number of children who would survive having gone 4 hours between severe head trauma and receiving medical attention, because "nobody's done that experiment and nobody would do such an experiment." Nonetheless, he testified that if a child makes it 4 hours, "it suggests some hope that [the child] might have made it if [he or she had] got[ten] early, quick medical attention," and that "if you have 100 children and a severe injury that they could've survived four hours, and then they finally did get medical attention and died after having got[ten] medical attention, say four hours or so later, I think you'd find that a substantial fraction actually can be saved."

Dr. Alexander testified that "the only way you could resolve [having a child manifest symptoms of head trauma] at 7 [p.m.] and yet still end[ing] up with the result [that the child is alive] at 11 p.m. . . . would be that this is an injury that might have been

survivable." Dr. Alexander was asked whether there was "a significant delay that impacted [Vivianna's] well-being," and his answer was:

> I think with this much delay[, Vivianna's] still being able to survive that period of time when most kids would have been invariably fatal, would have died within an hour or two[,] suggests to me that it wasn't invariably fatal. And that's where I think the delay may have contributed to [Vivianna's] being dead.

Dr. Alexander said that Muro and Jose were responsible for the delay, although he acknowledged that there was no way to say that the delay resulted in death "for sure." Dr. Alexander testified that there was simply no way to quantify the specific chances for survival because "we really don't have the experiment. I mean, there's no way we could actually do this to living people."

Dr. Parys, Vivianna's treating physician during the transfer to Good Samaritan Hospital in Kearney, and then at Good Samaritan Hospital until she was removed from life support, testified on direct examination that his opinion, to a reasonable degree of medical certainty, was that if treatment would have been sought earlier, there would have been a chance of survival. Both Dr. Parys and Dr. Alexander testified that had Muro sought care for Vivianna earlier, she would have had a chance to survive the brain injury. The medical testimony as a whole demonstrates that in this type of injury, the sooner treatment is sought, the better the chances of survival are, and that the absence of treatment decreases the chance of survival.

Considering all of this evidence in a light most favorable to the prosecution, we do not find clearly erroneous the court's finding beyond a reasonable doubt that the death of Vivianna was the inevitable result of Muro's failure to seek care. The trial court also specifically found that the "deprivation of care substantially and materially contributed in a natural and continuous sequence unbroken by any efficient intervening cause to the death of [Vivianna]." The above evidence supports the court's finding and provides a basis on which a rational trier of fact could find that Muro's failure to seek care for Vivianna materially contributed in a natural sequence to Vivianna's death because she was deprived of the chance to be saved by prompt treatment.

The evidence indicates that Vivianna's survival for nearly 4 hours demonstrated that the injury was not invariably fatal and that she had an opportunity to survive if she had received timely treatment. Muro failed to secure such treatment for a period of 4 hours, by which time the opportunity to survive was gone. Dr. Alexander testified that "because of a delay in getting medical attention it turned into a hopeless case," and Dr. Parys testified that "there was very, very little chance of saving [Vivianna's] life" by the time she received medical attention.

Had timely treatment been secured, Vivianna had a reasonable likelihood of survival; as a result of Muro's actions, according to Dr. Alexander, "it was too late by the time she finally did get care." As a result, we cannot find the court's findings on proximate cause to be clearly erroneous.

The present case is significantly distinguishable from the case cited by Muro, *State v. Doyle*, 205 Neb. 234, 287 N.W.2d 59 (1980). *State v. Doyle* involved a prosecution for manslaughter after a dead human infant was found on premises occupied by the defendant and her family where evidence indicated that the defendant had been pregnant prior to the discovery of the infant. The medical evidence was that the infant was at or near term and had been born alive and that there was no evidence of internal or external trauma. The pathologist was unable to testify as to the cause of death. On the issue of proximate cause, the Nebraska Supreme Court found that there was no evidence that the defendant had willfully or negligently done, or failed to do, anything which caused or permitted the life of the infant to be endangered. In the present case, however, there is abundant evidence of Muro's failure to seek medical attention at a time when she knew Vivianna was seriously injured or ill. Additionally, there is abundant evidence that such failure deprived Vivianna of the chance to survive her injuries. Therefore, we do not find *State v. Doyle* to be applicable.

Although we are mindful of the concerns raised by the dissent herein, we reject the argument that the State had the burden to show by a reasonable degree of medical certainty that Vivianna's chances of survival had Muro sought medical care sooner were "more likely than not" or some other bright-line percentage. See *Eversley v. State*, 748 So.2d 963, 968 (Fla. 1999) (medical

evidence as to cause of death need not be expressed in terms of medical certainty; it is sufficient if expert testifies that conduct " 'could,' " " 'might have,' " or " 'probably did' " cause death). See, also, *Mallory v. State*, 563 N.E.2d 640, 642 (Ind. App. 1990) (doctor testified child's injuries were treatable and child "could have" survived with prompt medical attention); *State v. Williams*, 4 Wash. App. 908, 484 P.2d 1167 (1971) (parents should have known baby required medical attention at time when treatment could have been effective to save baby); Annot., 118 A.L.R. 5th 253 (2004) (cases cited therein).

There is no case in Nebraska establishing that in cases such as this, the State must prove that the child's chances of survival were higher than an arbitrary predetermined percentage. Aside from the lack of precedent on this issue, we think using such a preestablished bright-line rule would fail to account for the particular factual nuances that are present in cases such as these. We are at a loss as to where such a bright line should be set and what the justification for such a particular line would be; why might a 50-percent chance of survival be sufficient, but a 49-percent not sufficient, for example? In addition, Dr. Alexander testified to the primary reason that such a percentage cannot be given: The only way to know such a percentage would be to conduct studies that cannot feasibly be conducted with human life. We think it sufficient that the evidence establish that the injury could have been survived but for a defendant's actions.

The evidence in the present case indicated that there was a possibility for Vivianna to survive these injuries, but for Muro's failure to seek medical attention for Vivianna. Whether that possibility was 5 percent, better than 50-50, between 5 percent and 95 percent, or reasonably likely, we conclude that the evidence that there was a possibility of survival and that Muro's actions removed that possibility of survival is sufficient, under current Nebraska law, to support the court's conclusion on proximate cause. Muro's assertions to the contrary are, therefore, without merit.

### (f) Resolution on Sufficiency

The evidence, viewed in a light most favorable to the State, was sufficient for a rational trier of fact to find that the essential elements of felony child abuse resulting in death were proven

beyond a reasonable doubt. The evidence was sufficient to support the trial court's conclusion that Muro acted knowingly and intentionally, that her actions knowingly and intentionally deprived Vivianna of necessary medical care, and that such denial of medical care was a proximate cause of Vivianna's death. Thus, the evidence, viewed in a light most favorable to the State, was sufficient to support the conviction. Muro's first assignment of error is without merit.

### 2. EXCESSIVE SENTENCE

Muro also asserts that the sentence imposed by the court was excessive. Muro argues that any conduct on her part, whether an affirmative action or an omission, does not warrant a sentence of 20 years' imprisonment. On the record presented, however, we find the sentence imposed to be within the statutory limits, and we do not find an abuse of discretion.

The law is well established that an appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Holecek*, 260 Neb. 976, 621 N.W.2d 100 (2000).

In imposing a sentence, the sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct and motivation for the offense, the nature of the offense, and the amount of violence involved in the commission of the crime. See *State v. Decker, supra*. When a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed. *Id.*

It is not the function of an appellate court to conduct a de novo review of the record to determine the appropriateness of a sentence. See *State v. Ellen*, 243 Neb. 522, 500 N.W.2d 818 (1993). The sentencing court is not limited in its discretion to

any mathematically applied set of factors. *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *Id.*

As noted, because the trial court found Muro's conduct to be knowing and intentional, she was found guilty of felony child abuse, a Class IB felony offense. See § 28-707. Pursuant to § 28-105(1), a Class IB felony is punishable by a maximum of life imprisonment and a minimum of 20 years' imprisonment.

As such, the 20-year sentence imposed on Muro is within the statutory guidelines and is actually the lightest sentence which could have been imposed short of probation. The trial court specifically noted as much when imposing the sentence. Therefore, the sentence should not be disturbed unless there has been an abuse of discretion by the trial court. See *State v. Decker, supra.*

In this case, the record indicates that the sentencing judge reviewed Muro's presentence report and considered numerous factors including Muro's age, mentality, education level, experience, social and cultural background, lack of any prior criminal background, and remorse for the events that led to Vivianna's death. In imposing the 20-year sentence, the court felt that probation would not be appropriate, stating that it "would depreciate the seriousness of this crime and . . . promote disrespect for the law." We cannot find the court's decision in this regard, where the court found that the result of Muro's inaction was the death of Vivianna, her 8-month-old daughter, to be an abuse of discretion. The sentence imposed is well below the maximum penalty allowed and is clearly within the statutory limits, and we find no abuse of discretion. This assignment of error is also without merit.

## V. CONCLUSION

For the reasons stated herein, we find that there was sufficient evidence to sustain the conviction and that the sentence imposed was not excessive. Viewed in a light most favorable to the State, the evidence was sufficient to support the trial court's finding that Muro acted knowingly and intentionally; that her conduct deprived her daughter, Vivianna, of necessary medical care; and

that such deprivation of medical care was a proximate cause of Vivianna's death. The sentence imposed by the court, 20 years' imprisonment, was the most lenient sentence possible within the statutory guidelines, short of a term of probation, and the court did not abuse its discretion in determining that probation would be inappropriate in this case. Consequently, we affirm.

AFFIRMED.

SIEVERS, Judge, dissenting.

With all due respect, I cannot join the majority opinion. My factual framework, for analytical purposes, is as follows: There is no evidence that the severe head trauma Vivianna suffered was inflicted by the defendant, Muro; but she became aware, by her own admission, at 7 p.m. on October 27, 2002, that Vivianna was seriously injured or ill. Yet, Muro failed to seek help for Vivianna until shortly after 11 p.m., when she and Jose took Vivianna to Tri-County Hospital.

I have no hesitancy whatsoever in agreeing with the trial court's finding, affirmed by my colleagues, that Muro knowingly and intentionally failed to provide necessary care to Vivianna. However, under § 28-707, for this conviction to stand, the act of child abuse—failure to provide necessary care in this case—must be one which "results in the death of such child." This language poses the question of what the State must prove in order to establish the statutorily required relationship between the act of abuse and the child's death. I submit that the focus must be on the language of the statute requiring that the abuse "result[ed]" in Vivianna's death in order for Muro to be convicted of the Class IB felony.

Therefore, the question becomes whether the evidence is sufficient to prove causation. It is apparent from the recitation of evidence in the majority opinion that the proposition that Vivianna would not have died but for Muro's failure to seek necessary care is, at best, extremely tenuous. The doctors repeatedly testified in terms of "possibly," "could have," "might have," or "may have." Whether Vivianna would have lived or died had medical treatment been sought sooner is obviously a question requiring expert medical testimony. There was no medical testimony that it was probable that the failure to obtain necessary care earlier than 11 p.m. was a cause of Vivianna's death, and therein lies the problem.

Most of the Nebraska case law on the sometimes difficult subject of causation in criminal cases involves motor vehicle homicide prosecutions. For example, in *State v. Sommers*, 201 Neb. 809, 272 N.W.2d 367 (1978), the defendant was charged with motor vehicle homicide by virtue of an allegation that he unlawfully operated his vehicle by having .10 of 1 percent or more by weight of alcohol in his body at the time he collided with the decedent's vehicle. The court first said that the State's burden was to prove the unlawful presence of alcohol in the defendant's bodily fluid and then "the further burden to establish that this unlawful act was a proximate cause of the death of the deceased." *Id.* at 810-11, 272 N.W.2d at 369. The court in *State v. Sommers*, 201 Neb. at 811-12, 272 N.W.2d at 369, said that by proximate cause in a case involving death, it "meant a moving or effective cause or fault which, in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the death and without which the death would not have occurred." The phrase "without which" frames my difficulty.

In *State v. William*, 231 Neb. 84, 88, 435 N.W.2d 174, 177 (1989), the court, again in a motor vehicle homicide prosecution, extensively discusses proximate cause and, quoting from its earlier opinion in *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986), which quoted in part from *State v. Spates*, 176 Conn. 227, 405 A.2d 656 (1978), twice said:

> "Conduct . . . is not a cause of an event if that event would have occurred without such conduct. . . .
>
> . . . .
>
> " '[Conduct which proximately causes death] is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. . . .' "

The court in *State v. William* makes it clear that to give rise to criminal liability, the harm which results need not be intended, and that it is sufficient where death or injury caused by the defendant's conduct is a foreseeable and natural result of the conduct. The court in *State v. William* used *State v. Rotella*, 196 Neb. 741, 246 N.W.2d 74 (1976), to emphasize that in a motor vehicle homicide case, contributory negligence on the part of the deceased is not a defense

to the charge, and that the issue " 'is whether [the] defendant's violation of law was a contributing factor to the death.' " (Emphasis omitted.) 231 Neb. at 89, 435 N.W.2d at 178.

In *State v. William*, the defendant claimed that the police officer who was chasing him was violating police policy or was negligent in his decision to pursue the defendant at high rates of speed. However, the court found that the defendant's actions were the proximate cause of the death of his passenger when he collided with another vehicle at an intersection during the pursuit. The court in *State v. William* said that the defendant's flight from the officer, his high rate of speed, and his failure to stop at the final stop sign all made up " ' "the cause without which the death would not have occurred." ' " 231 Neb. at 90, 435 N.W.2d at 178. The court in *State v. William* said that even if the officer's actions were incorrect, they did not negate the conclusion that it was the defendant's conduct which was the efficient cause, the one that necessarily set in operation the factors that accomplished the death. To me, the foregoing cases define the issue in this case, given the statutory language of § 28-707(6). Thus, I believe the issue is whether the failure to seek necessary care was such that it was " 'the cause without which the death would not have occurred.' " *State v. Dixon*, 222 Neb. at 797, 387 N.W.2d at 688.

The problem inherent in using the foregoing authority involving motor vehicle homicide is that while the statements of legal principles are cogent, the facts in the foregoing motor vehicle homicide cases are clearly distinguishable from those in this case. In the instant case, it is not a matter of a motorcyclist with a passenger fleeing from a pursuing police car at an excessive rate of speed who collides with a third vehicle at an intersection, causing the passenger's death, but, rather, a matter of a severe head injury that has already been inflicted on a child and the child's mother's becoming aware of the child's dire condition at 7 p.m. but not going to the hospital until 4 hours later. The testimony of medical experts established that without treatment, the head injury was inevitably fatal, and the trial judge so found. However, the conclusion that the injury was inevitably fatal without treatment begs the question of causation—as such can be said of virtually any severe injury if it goes untreated long enough. Thus, concluding that the head injury to Vivianna was inevitably

fatal without treatment is really an essentially meaningless conclusion. Moreover, evidence that the injury was inevitably fatal without treatment does not equate to proof of causation in this case—because treatment was in fact sought. Rather, the core question is whether, with the requisite degree of probability, earlier treatment would have made a difference—meaning whether it was probable that Vivianna would have lived, because the proof must show that the delay caused her death. I submit that the medical evidence does not establish, by the required standard of proof, that Vivianna could have been saved by earlier treatment.

The standard for medical proof we have typically applied is probability. For example, in *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999), a medical malpractice case, the defendant doctor contended that a directed verdict should have been entered. The Nebraska Supreme Court discussed the evidence needed to establish proximate cause of the plaintiff's claimed injury. *Doe v. Zedek* makes it abundantly clear that even if a defendant doctor is negligent, such negligence is not actionable unless it is "a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them." 255 Neb. at 970, 587 N.W.2d at 891. The court in *Doe v. Zedek* found that the plaintiff's claim was such that it was subjective in nature and that thus, the cause and extent of the injury had to be established by expert medical testimony. Obviously, the effect of a delay in treatment, given severe injuries such as Vivianna's in this case, is likewise a subject for expert testimony. The court in *Doe v. Zedek* found that the use of the term "possible" by the plaintiff's expert was insufficient because it did not "encompass either 'reasonable medical certainty' or 'reasonable probability,' i.e., more likely than not." 255 Neb. at 975, 587 N.W.2d at 893. The court elaborated that "possible" is "mere speculation, which is not sufficient"; that while the medical testimony need not be couched in magic words such as reasonable medical certainty or reasonable probability, it must be "sufficient as examined in its entirety to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence," *id.* at 975, 587 N.W.2d at 894; and that because medical expert testimony regarding causation based upon possibility or speculation is insufficient, "it must be stated as being at least 'probable,' in other words, more likely than not," *id.*, citing

*Berggern v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996). The court in *Doe v. Zedek, supra,* thus concluded that the plaintiff failed to meet her burden of proof on the issue of causation and that the defendant's motion for a directed verdict should have been granted. See, also, *Morton v. Hunt Transp.*, 240 Neb. 63, 480 N.W.2d 217 (1992) (medical causation testimony expressed in terms of possibility is generally insufficient though testimony couched in terms of probability may be sufficient, and sufficiency of expert's opinion is judged in context of expert's entire statement); *Fowler v. Lester Electric*, 1 Neb. App. 693, 501 N.W.2d 728 (1993) (medical testimony couched in terms of possibility is insufficient to prove causation). The last two mentioned cases are workers' compensation cases.

The majority mistakenly argues that I seek a "bright-line" rule that the medical testimony or testimony of a chance of survival should be of a particular numerical percentage. Rather, I seek application of the same rule which we have applied in cases of far less consequence than this. Indeed, I respectfully suggest to my colleagues that the rule I seek to have applied has already been laid down in *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). That rule is that medical evidence which is offered to prove an inherently subjective proposition about which neither judge nor jury can know without expertise cannot be merely guesswork or speculation—which is all there is here (and I quote the majority's opinion: "The evidence in the present case indicated that there was a possibility for Vivianna to survive these injuries, but for Muro's failure to seek medical attention for Vivianna" and "[W]e conclude that the evidence that there was a possibility of survival and that Muro's actions removed that possibility of survival is sufficient").

Instead, *Doe v. Zedek* teaches that such evidence must rise to the level of probability, or of "more likely than not" or "reasonable medical certainty." The majority fails to explain why the standard for medical evidence to collect money in a civil case does not apply with equal force when a criminal defendant's liberty is at stake—the liberty of a defendant who must be proved guilty beyond a reasonable doubt. The majority's reasoning becomes the functional equivalent of concluding that the evidence shows "it is possible that Muro committed this crime."

Accordingly, I conclude that we should not impose a 20-year prison sentence on Muro using medical testimony which gets no stronger than a "possibility" or a "chance" that Vivianna "might" have survived the injury, which the evidence suggests was inflicted by Jose, had she gotten Vivianna to the hospital sometime before approximately 11 p.m. In short, a criminal conviction which requires proof of guilt beyond a reasonable doubt should not be based upon medical evidence of proximate cause which would, as a matter of law, clearly fall short of the proof needed to support a workers' compensation claim, a personal injury claim, or a medical malpractice claim. And, this is particularly so when these types of civil cases require proof by only a preponderance of the evidence, a far lesser standard of proof than the proof beyond a reasonable doubt required here.

In 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(c) (2d ed. 2003), the author suggests that while problems of legal causation arise in both tort and criminal settings and courts have generally treated legal causation the same in criminal law as in tort law, there is a move away from the notion that in criminal cases, the legal causation requirement applicable in tort cases is controlling. As justification for that movement, the author explains that "[t]he requirement of causation in criminal law, more often than not, serves not to free defendants from all liability but rather to limit their punishment consistent[ly] with accepted theories of punishment." *Id.* at 472.

I suggest, remembering that § 28-707 is a statutory scheme defining certain acts of child abuse and then grading those criminal acts in severity according to the defendant's state of mind and the result, that LaFave's observation is particularly pertinent here. In other words, if there is no expert medical evidence which meets the *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999), standard in proving that Muro's inaction was such that without such inaction, Vivianna would not have died, then we should not convict Muro of the most severe crime under the child abuse statute, § 28-707(6)—causing the child's death, a Class IB felony.

No physician was willing to testify that even if Vivianna had been brought to the hospital immediately after 7 p.m., when Muro became aware of Vivianna condition, it was more likely than not, it was probable, or it was reasonably certain that Vivianna would

have survived. The best any doctor could offer was that Vivianna had "a chance" and that it was "possible" or there was a "5% chance" she would have survived.

I would hold that the medical evidence, taken as a whole, was insufficient as a matter of law to prove that the child abuse committed by Muro, i.e., delay in seeking treatment, "result[ed] in the death of [Vivianna]," see § 28-707(6). As a result, Muro could not be found guilty beyond a reasonable doubt of the crime with which she was charged. Muro should have been convicted of the lesser-included offense, a Class IIIA felony, where the child abuse is committed knowingly and intentionally but "does not result in serious bodily injury," § 28-707(4). I come to this result because of another failure of proof. Neb. Rev. Stat. § 28-109(20) (Cum. Supp. 2002) defines serious bodily injury for the purpose of § 28-707 to be bodily injury which involves, in the worst case, a substantial risk of death. There is also no medical evidence meeting the requisite standard that Muro's inaction caused a substantial risk of death above and beyond that posed by the original injury to Vivianna's brain—which injury no one claims Muro inflicted.

For the foregoing reasons, I would reverse the district court's judgment and remand the cause with directions to find Muro guilty only of the Class IIIA felony under § 28-707(4), which carries a maximum penalty of 5 years' imprisonment, as she clearly "abused" Vivianna by failing to seek necessary and proper care. Because proper proof of the consequences of that failure is lacking, except for guess, chances, possibilities, and speculation, I respectfully dissent.